Orville SELLON and Levi Baggs, Administrator of the Estate of Alice Baggs, deceased, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, a corporation of the State of Delaware, Defendant,

v.

Christine F. SMITH, Third-Party Defendant.

Civ. A. No. 79–611.

United States District Court, D. Delaware.

Sept. 9, 1981.

William J. Wier, Jr., Thomas C. Crumplar, and Terry Curtis Seningen, Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiffs.

Robert K. Payson, and Somers S. Price, Jr., Potter, Anderson & Corroon, Wilmington, Del., for defendant.

Wayne N. Elliott, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for third-party defendant.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

In this personal injury diversity action, two Canadian plaintiffs seek damages from General Motors ("GM"), a Delaware corporation, on three claims of negligence, breach of warranty and reckless disregard of faulty design of the car whose explosion occasioned this suit.[1] Presently before the Court are plaintiffs' motion for summary judgment and defendant's motion for judgment on the pleadings. These motions require determination of the question whether a broadly phrased release in favor of the

---

1. A fourth count alleging strict liability in tort is not involved in the present motions. Defendant had filed a motion to dismiss that claim for failure to state a claim but at a conference the parties agreed to stay briefing pending a decision by the Delaware Supreme Court on whether or not a strict liability cause of action exists in Delaware. That decision has now come down, but has not yet been addressed of record by the parties.

third-party defendant also bars recovery against General Motors.

*The Facts*

On January 13, 1978, a car driven by third-party defendant Christine F. Smith struck the rear of a 1973 Oldsmobile Omega manufactured by defendant GM and driven by plaintiff Orville Sellon with plaintiff Baggs' decedent Alice Baggs as a passenger. The Omega burst into flames which engulfed the car causing severe injury to Sellon and fatal injury to Mrs. Baggs. During the following year, plaintiffs' Delaware counsel negotiated a settlement with Smith and her insurer, Insurance Company of North America ("INA"). The settlement resulted in payment to plaintiffs and others[2] of $299,999 from the $300,000 insurance policy. In return, the releases were executed whose effect forms the basis of these motions. The documents signed by Baggs and Sellon "release, acquit and forever discharge William N. Smith and Christine F. Smith and his, her, their, or its agents, servants, successors, heirs, executors, administrators *and all other persons, firms, corporations, associations or partnerships*." [emphasis supplied]

This form of release was supplied by INA after discussions with representatives of the Smiths and plaintiffs. In February, 1979, plaintiffs' Delaware counsel accepted the documents and transmitted them to Canadian counsel for Sellon and Baggs. (Affidavit of Robert Jacobs, Esq., and attachments). Counsel reviewed the documents and presented them to plaintiffs who read them "in a cursory manner" and signed. (Affidavits of Joseph F. Foreman, Q. C., Doc.No. 29, and of J. Paul Roche, Q. C., Doc. No. 32 and Affidavits of Orville Sellon, Doc. No. 30 and of Levi Baggs, Doc. No. 31).

In December, 1979, plaintiffs filed this action against GM. GM answered with a number of affirmative defenses and filed a third-party complaint against Smith on the grounds that she was wholly or jointly liable for plaintiffs' injuries. Discovery ensued in which the releases between plaintiffs and Smith were brought to light. As a consequence, GM amended its answer to allege a complete affirmative defense based on the releases. In its motion for judgment on the pleadings, GM argues that the language discharging "all other persons, firms, corporations, associations or partnerships" relieves it of liability. In their motion for summary judgment, plaintiffs reply that this phrase does not include GM because the parties to the agreement had no such intent. If, say plaintiffs, the release is construed to release GM, then this Court should reform the contract because of mutual mistake regarding the effect of the language.

After oral argument on the motions, the Court determined that the case of *Chakov v. Outboard Marine Corp.*, then on appeal to the Delaware Supreme Court, could be determinative in this diversity case. Accordingly, this matter was stayed pending the outcome of *Chakov*. Opinions in that case having issued,[3] and the parties having supplemented their briefs in letter memoranda, the motions are ready for decision.

*Choice of Law*

The first issue for decision is which law will govern this action. Under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the federal district court exercising diversity jurisdiction must look to appropriate state substantive law. Delaware choice of law rules control since Delaware is the forum state. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). At this point, it becomes

---

2. The Baggs release discharges the estate's claim for $30,000 (Opening Brief of General Motors, Exh. A); Sellon's release settled for $268,693.56 (Opening Brief of General Motors, Exh. B). Further payments from the policy were $205.44 to one Richard Sapp who participated in the rescue of Sellon and $1,100 to Sellon for property damage to his vehicle.

Thus, INA paid all but $1.00 of the Smith policy.

3. A panel per curiam opinion of the Delaware Supreme Court issued on February 23, 1981, was superseded by an en banc opinion which issued April 30, 1981. *Chakov v. Outboard Marine Corporation*, 429 A.2d 984 (Del.Supr. 1981).

necessary to determine the nature of the action in order to apply the proper rule. Unfortunately, neither the parties nor the Court has been able to uncover Delaware case law pertinent to conflicts issues regarding the effect of a release.[4] Therefore the more general categories of tort law and contract law will have to be examined. Although the parties appear to have viewed the claims as sounding in tort, the Court is of the opinion that, with the reduction of the summary judgment issue to the legal effect of the release, this aspect of the case is more properly regarded as a contract matter. Whatever the characterization, however, it would appear that Delaware's substantive law applies.

■ Delaware's choice of law rule in tort cases is fairly clearcut. The law of the place of the injury, Delaware, governs the action. *See Friday v. Smoot*, Del.Supr., 211 A.2d 594 (1965); *TEW v. Sun Oil Co.*, Del. Super., 407 A.2d 240, 242 (1979); *Unit, Inc. v. Kentucky Fried Chicken Corporation*, Del.Super. 304 A.2d 320, 329 (1973).[5]

■ If the action is viewed as one of contract, the same conclusion results although the route to that end is more circuitous. Recent Delaware cases suggest that rather than the old rule in which the place of the making of the contract governs, here Canada,[6] the State now accepts the standard of the *Restatement (Second) Conflict of Laws* which advocates application of the law of the state that has the "most significant relationship to the transaction." 1 *Restatement (Second) Conflict of Laws* § 188(1) at 575 (1971). This section is cited and paraphrased in a recent Delaware Supreme Court case involving an indemnity clause in a purchase-order contract. *Oliver B. Cannon and Son v. Dorr-Oliver, Inc.*, Del.Supr. 394 A.2d 1160, 1166 (1978). There, the Delaware Supreme Court considered the Delaware residence of two of the parties, and the Delaware location of the property and the lawsuit which gave rise to the claim for indemnification sufficient to establish that Delaware had "such a close relationship to the transaction and the parties that we should apply Delaware law." *Id.* The message taken by the lower Delaware State courts is that the *Restatement's* test is now a force in Delaware choice-of-law/contract cases. *See TEW v. Sun Oil Co.*, Del.Supr., 407 A.2d 240, 242 (1979) (*dictum*).[7] Therefore this Court will

---

**4.** *Bittner v. Little*, 270 F.2d 286 (3d Cir. 1959), is not determinative for it concerns choice of law in the validity of a release under the conflicts principles of Pennsylvania, not Delaware. Moreover, the case predates the highly influential *Restatement (Second) Conflict of Laws* and so may not be an accurate guide to the Delaware Supreme Court's current view. *See Rutherford v. Gray Line, Inc.*, 615 F.2d 944 (2d Cir. 1980).

**5.** Recently federal courts have criticized the "wooden" application of this rule. *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 316 n.22, 101 S.Ct. 633, 642 n.22, 66 L.Ed.2d 521 (1981) (plurality opinion); *Rutherford v. Gray Line, Inc.*, 615 F.2d 944 (2d Cir. 1980). This case does not, however, present the necessity for re-examining the *lex loci delicti* doctrine for Delaware has significant contacts with the tort issue quite apart from being the place of injury. There is no danger of violating due process requirements by applying the law of the state that is and was the home of the defendants in a tort case as well as the site of the accident. *See Allstate Ins. Co., supra.*

**6.** The release was signed in Canada. Defendant argues, not unpersuasively, that the real

place of making is Delaware because all substantive negotiations occurred here and only the formality of signing took place in Canada. The Court is leery of this reasoning in a case where the result may turn on what was believed by the parties at the moment of that formality. However, the developments in Delaware law, outlined below, indicate that there is no need to split hairs over identification of the place of contracting.

**7.** Indeed, the "significant relationship" test is not foreign to earlier Delaware law. While the traditional rule that the place of making the contract establishes the law of that contract was often cited, *see, e. g., Unit, Inc. v. Kentucky Fried Chicken Corp.*, Del.Super. 304 A.2d 320 (1973), the Delaware courts did engage in more elaborate reasoning when the state that formally harbored the contract was not significantly involved with the interests created by the agreement. For example, in *Dick v. Reves*, 206 A.2d 671 (Del.Supr.1965), the court applied Pennsylvania law to a sale of realty when the negotiations and the property were located in Pennsylvania and Delaware's only connection was that the documents were signed in Delaware.

examine the issue under the "most significant relationship" test.

■ Application of the *Restatement* test reveals that Delaware has a larger stake than has Canada in governing the validity of these releases. Both General Motors Corporation and the third-party defendant for whose benefit the agreement was negotiated are citizens of Delaware. INA is a Pennsylvania corporation doing business in Delaware. Uncontested portions of plaintiffs' affidavits make clear that the substance of negotiations between INA and the plaintiffs occurred in Delaware through plaintiffs' local counsel, Bader, Dorsey & Kreshtool.[8] In addition, the accident and the evidence connected with it are in Delaware. While Canada has a significant interest in seeing that plaintiffs, its citizens, are compensated for their injury, this cannot outweigh the factors outlined above, particularly Delaware's interest in control of the meaning of documents created by its attorneys and concerning its citizens, Smith and GM, as much as Canada's citizens, Sellon and Baggs. Therefore Delaware law will govern this suit.

*GM's Motion—The "Plain Meaning" of the Releases*

■ In its motion for judgment on the pleadings (Doc. No. 19), GM relied only on the Sellon and Baggs releases attached to its amendment to its answer (Doc. No. 14). Consequently, the Court will treat this motion as limited to the question whether the language of the documents is sufficient to release GM without reference to extrinsic facts. The issue of the extrinsic facts' significance arises from plaintiffs' motion for summary judgment and is dealt with below. There being no disagreement as to the language of the agreements the issue is solely one of law. However, the Court must draw from the language all inferences favorable to plaintiffs. *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980); *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

GM contends that the contractual language releasing claims against "all other persons, firms, corporations, associations or partnerships" expressly dissolves its potential liability. This interpretation, it is said, reflects the plain meaning of the documents and, under the parol evidence rule, cannot be varied by reference to extrinsic evidence. They cite several cases from other jurisdictions in which courts confronted with similar language found that it "plainly" covers unnamed third-party corporations. *See, e. g., Frank v. Volkswagenwerk, A.G.*, 522 F.2d 321, 328 (3d Cir. 1975); *Dorenzo v. General Motors Corporation*, 334 F.Supp. 1155 (E.D.Pa.1971); *Peters v. Butler*, 251 A.2d 600 (Md.Ct.App.1969). GM also references the Delaware joint tortfeasor statute's restriction on release of joint tortfeasors: release of one does not extinguish liability of others "unless the release so provides." 10 *Del.C.* § 6304(a).[9] It is urged that the broad release here does "so provide."

---

**8.** The negotiations are described in the affidavit of Robert Jacobs, Esq. of Bader, Dorsey & Kreshtool. (Doc. No. 35). Plaintiff Sellon's Canada counsel, Joseph F. Foreman, Q.C., has also submitted an affidavit which makes it clear that he did not participate in the actual formation of the agreement with INA and Smith. (Doc. No. 29). Canada counsel for plaintiff Baggs, J. Paul Roche, Q.C., testifies that the "acted as an intermediary between [Baggs] and his Delaware counsel." (Roche Affidavit, Doc. No. 32 at 1).

**9.** The statute provides in full:

(a) A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other joint tort-feasor unless the release so provides;

but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

(b) A release by the injured person of one joint tort-feasor does not relieve him from liability to make contribution to another joint tort-feasor unless the release is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the prorata share of the released tort-feasor, of the injured person's damages recoverable against all the other tort-feasors.

10 *Del.C.* § 6304.

Plaintiffs counter the plain meaning argument with evidence tending to show that the contracting parties understood that a suit against GM was contemplated.[10] If admitted and interpreted most favorably to plaintiffs, this evidence could prevent GM from carrying its burden of proving that the releases, properly read, applied to it.

The so-called parol evidence rule is not, in fact, an evidentiary rule, but one of substantive contract law. Consequently, this Court must apply the Delaware version of the rule. *See Three Rivers Motor Company v. Ford Motor Company*, 522 F.2d 885 (3d Cir. 1975).

GM is correct that, in general, "the plain terms of the contract may not be varied by parol evidence." *Gracelawn Memorial Park, Inc. v. Eastern Memorial Consultants, Inc.*, 291 A.2d 276 (Del.Supr.1972); *Seiler v. Levitz Furniture Co.*, 367 A.2d 999 (Del. Supr.1976). The question is whether the meaning of the Sellon and Baggs releases is plain. Recently, the courts of this State have addressed evidentiary questions relating to interpretation of "general releases." Unlike the authorities cited by GM, the Delaware cases evince unwillingness to rest on the plain meaning rule to the exclusion of conflicting evidence of intent when one not a party to the release seeks to benefit from its general language. *See Betts v. Faulkner*, 411 A.2d 608 (Del.Super., 1980), *aff'd by judgment order*, 414 A.2d 820, (Del. Supr., 1980);[11] *Clute v. Zimmer, U.S.A. Ltd.*, C.A.No. 37 (Del.Super., Nov. 21, 1975). *Cf. Clark v. Brooks*, 377 A.2d 365, 369–70 (Del.Super.1977), *aff'd sub nom. Blackshear v. Clark*, 391 A.2d 747 (Del.Supr.1978) (disapproving "extending the benefit of a release to those who were not specifically intended to benefit by the release"). Most recently, the State Supreme Court indicated in dictum that broad language like that of the releases before this Court may be inherently confusing. *Chakov v. Outboard Marine Corp.*, 429 A.2d 984, 985 (Del.Supr.1981) (en banc).[12] In view of this background, a more detailed examination of the Sellon and Baggs releases must be undertaken. If the language does reveal confusion about what entities were released, then extrinsic evidence bearing on the parties' intention will be admissible.

To comprehend a contract, all of its terms must be addressed. No single phrase, in isolation, controls the agreement. *See Clark v. Brooks, supra,* 377 A.2d at 373;

---

**10.** Plaintiffs also argue that the releases themselves make clear that further suit was intended because not all of Smith's $300,000 insurance policy was turned over to plaintiffs. Instead, $1.00 remained with INA to insure that, if Smith were subsequently sued as a third-party defendant (the present eventuality), INA would be required to represent her. While it is true that the reservation to INA for defense purposes constitutes evidence of plaintiffs' plans to undertake further legal action, this reservation does not appear from the face of either release. One is in the sum of $30,000, the other for $268,693.56. These do not hint at a sum left with the insurance company. Nor do their combined figures total $299,999, the number plaintiffs' counsel deems so evocative of intent to sue. The documents reveal that various small sums were paid for property damage and to a rescuer (*see* note 2, *supra*), but none of these facts appear from the releases themselves.

**11.** Under Delaware Supreme Court Rule 17(a)(iii), a judgment order has no precedential value.

**12.** In *Chakov*, the lower court had held, contrary to *Betts* and *Clute*, that parol evidence was inadmissible to prevent application of the general release to a third-party corporation. *Chakov v. Outboard Marine Corp.*, No. 79C–JL67 & 99C–AU–4 (Del.Super., April 8, 1980) *supplemented on* July 7, 1980 (unreported letter opinions). The Supreme Court affirmed summary judgment for defendant on the ground that the extrinsic evidence showed that the parties had agreed specifically to release Outboard Marine. This finding permitted the court to decline ruling on the parol evidence question; ambiguity was assumed with the strictures noted above. *Chakov, supra,* 429 A.2d at 985. In one respect *Chakov*—a well as *Betts* and *Clute*—differs from the facts before this Court: none of those cases contained allegations of fraud, duress or mistake. This distinction does not change the interpretation of the releases' language. Rather it requires the Court to go on to the issue of reformation, discussed below, and examine plaintiffs' evidence under the quite different evidentiary standards applicable to a mutual mistake case. *See Matter of McCall*, 398 A.2d 1210, 1214 (Del.Super.1978).

*Raughley v. Delaware Coach Co.*, 91 A.2d 245, 248 (Del.Super.1952). In the release before this Court, there appears to be substance to the Delaware Supreme Court's fear of confusion:

### RELEASE OF ALL CLAIMS

KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, being of lawful age, for the sole consideration of Thirty Thousand and 00/100 Dollars ($30,000.00) to the undersigned in hand paid, receipt whereof is hereby acknowledged, do/does hereby and for my/our/its heirs, executors, administrators, successors and assigns release, acquit and forever discharge William N. Smith and Christine F. Smith and his, her, their, or its agents, servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 13th day of January, 1978, at or near Talleyville, New Castle County of the State of Delaware of the United States of America.

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that the said releases deny liability therefor and intend merely to avoid litigation and buy their peace.

The first paragraph couches the release in universal terms. The second paragraph purports to speak for the releasees in denying liability and describing their desire to avoid litigation. If the "parties hereby released" refer strictly to the Smiths and those, like INA, in privity with them and involved in the negotiations, then it makes sense that the document speak for them. However, such a limited reading of "parties hereby released" casts doubt on the prior language purporting to release all others. On the other hand, if "parties hereby released" has the universal scope claimed by GM, then, in denying liability and expressing intent to buy peace, the document, rather grandiloquently, purports to speak for the world. Such potential confusion was the concern of the *Chakov* court when it addressed

> general releases referring to 'other persons, firms or corporations.' Such releases might, in given circumstances, reasonably be read as referring only to third party entities related to the contracting parties obtaining the release. This is especially true when the release purports to speak for such third parties by denying any liability to the claimant.

*Chakov, supra*, at 985–986. Such guidance from the primary State authority would indicate that an ambiguity which might otherwise appear slight, is enough to necessitate admission of extrinsic evidence on the issue of the release's intended scope. To that extent this diversity holding faithfully follows the principles of *Frank v. Volkswagenwerk, A.G., supra*, although reaching an arguably different result. Moreover, this resolution comports with the requirement that inferences be drawn in favor of the nonmoving party. *See Bryson, supra.* In recognizing that the narrow interpretation of "parties hereby released" may narrow the whole scope of the release, the Court recognizes the validity of plaintiffs' position that evidence is needed to determine the intent of the parties.

Because this Court concludes that the issue of interpretation cannot be resolved on the sole basis of the releases' language,

GM's motion for judgment on the pleadings must be denied.[13]

*Plaintiffs' Motion—Interpretation of the Releases*

Sellon and Baggs counter GM's plain-meaning argument with a motion for summary judgment in their favor on the affirmative defense of the release. Both parties offer affidavits to fill out the factual record of the intent behind the release. As movant, plaintiffs bear the burden of demonstrating the absence of a genuine issue of material fact. All inferences will be drawn in defendant's favor; all allegations by GM are taken to be true. *See, e. g., Scott v. Plante*, 532 F.2d 939, 945 (3d Cir. 1976).

Plaintiffs contend that the 1978-79 negotiations between their attorneys and representatives of Smith and INA were based on the understanding that GM would be sued. With this history, plaintiffs urge, it would be impossible to interpret the releases as expressing an intent to absolve GM.

The documents reflecting the release negotiations make clear that plaintiffs' counsel regarded the general release as a means of preserving the hope of recovery against GM. In January, 1978, Delaware counsel wrote to Sellon's representative indicating, *inter alia*, that negligence and strict liability claims could be brought against GM (attachment to Affidavit of Robert Jacobs, Esq., Doc. No. 46). Subsequently plaintiffs' counsel investigated that possibility. By August, 1978, negotiations with a representative of Smith, the driver and her insurer, INA, were in progress.

At first, INA submitted for plaintiffs' approval the form of general release ultimately used, but with typed-in language adding that "This release reduces, to the extent of the pro-rata share of William N. Smith and Christine Smith, damages recoverable against all other tortfeasors in accordance with 10 Delaware Code, Section 6304." (Doc. No. 35, Exh. III).[14] Fearing that this provision would drastically lessen the amount of any award against GM, plaintiffs rejected the joint tortfeasor form, asking that a "general release" be drafted instead. (Doc. No. 34, first attachment). At that point counsel for Smith also wished to obtain a "general release" and to assure that INA would remain responsible for defense of Mrs. Smith should an indemnification action result from suit against GM. The documents make clear that INA and Smith recognized the possibility of legal action against GM. (Exhibits G–J to Jacobs Affidavit, Doc. No. 46). In a January, 1979, letter to Canadian counsel for plaintiffs, Delaware counsel referred to "the assumption that the Baggs estate will not choose to go forward against General Motors. . . . It is still free to do so, however." (Exhibit V to Jacobs Affidavit (Doc. No. 35). This evidence supports plaintiffs' averments in separate affidavits that, "in signing the release, I had no intention whatever of releasing General Motors Corporation or anyone other than Ms. Smith and her insurance agency." (Doc. No. 30 (Sellon); Doc. No. 31 (Baggs)).

The evidence of plaintiffs' intent to limit the language of the release does not establish that the parties shared an understanding that it would be so limited. GM's affidavits, taken to be true for these purposes, state that the effects of the general release language on future litigation were never discussed. (Erisman Affidavit, Doc. No. 42, Eichelberger Affidavit, Doc. No. 42). INA and Smith knew plaintiffs were contemplating litigation against GM and agreed to settle the claim against Smith for one dollar less than the policy limit in order to provide for legal representation if she became involved in subsequent litigation. It need not follow from this knowledge that they abandoned the hope of obtaining a release which might be used as a defense in such litigation. In fact after deleting the

---

**13.** It is also noted that, even if GM had successfully urged its interpretation of the releases, the Court could not have entered judgment on that basis, for plaintiffs, in addition to challenging GM's interpretation, have moved in the alternative for reformation due to mutual mistake. *See infra.*

**14.** *See* note 9 *supra.*

unacceptable joint tortfeasor provision, INA submitted for plaintiffs' consideration a release form which, while not wholly free of ambiguity, overtly conveys the impression that it is *not* limited to the Smiths and INA. Moreover, this form was offered in response to the request that a "general release be agreed on." In the absence of evidence that the parties focussed attention of the broad releasing language of this form, the Court cannot assume that INA and Smith accepted plaintiffs' desire not to release GM. Such an assumption would be contrary to the Smiths' interest in obtaining the broadest possible protection and contrary to the language of the release.

In sum, the Court has reviewed the evidence of negotiations between the parties to the release and the release's language itself. *See Chakov, supra,* 429 A.2d at 986. This review leads to conflicting inferences, possibly traceable to the apparent conflict between plaintiffs' expressed plans to sue GM and its request for a general release. A jury could conclude, with plaintiffs, that the shared knowledge of intent to sue GM was the motivating force of the bargaining and cannot have led to a bargain which would preclude that suit. However, viewing the evidence in the light most favorable to defendant, a jury might infer that INA's interest in obtaining a broad release led it to submit to plaintiffs' contractual language apparently precluding liability by GM. In the absence of objection by plaintiffs' negotiators, INA might be taken to have concluded that silence signified acquiescence to a release of general scope.

 "[T]he Court cannot grant summary judgment where there are conflicting factual inferences with regard to the scope of the release intended by its signatories." *Read v. Baker,* 430 F.Supp. 472, 474 (D.Del. 1977). *Accord Novak v. General Electric Corporation,* 282 F.Supp. 1010 (E.D.Pa. 1967); *Schine v. Schine,* 250 F.Supp. 822 (S.D.N.Y.1966). In this case, the record is inadequate to support a ruling on the intended scope of the release as a matter of law. That question of intent is a genuine issue of material fact precluding summary judgment. In so holding, the Court concurs in the oft-expressed precept that issues of intent are singularly ill-suited to resolution by summary judgment. *See, e. g., Watts v. University of Delaware,* 622 F.2d 47, 50 (3d Cir. 1980).

*Plaintiffs' Motion—Mutual Mistake*

The Court need not address at length plaintiffs' alternative plea for reformation of the contract on the ground of mutual mistake as to the releases' effect. It is enough to note that the party urging reformation must show, by clear and convincing evidence, a "prior, definite and specific oral agreement" that was erroneously omitted from the written document. *Collins v. Burke,* 418 A.2d 999, 1002 (Del.Supr. 1980). *See also Burris v. Wilmington Trust Co.,* 301 A.2d 277 (Del.Supr.1972); *Hob Tea Room v. Miller,* 33 Del.Ch. 38, 89 A.2d 851 (Supr.1952); *Colvocoresses v. W. S. Wasserman Co.,* 24 Del.Ch. 53, 4 A.2d 800 (1939). Since the prior agreement claimed here is the alleged understanding that GM was not to be released, this Court's disposition of the interpretation question controls: Mutual intent not to release GM has not been demonstrated as a matter of law. Accordingly, plaintiffs' motion will be denied.

An order will be entered in accordance with this opinion denying defendant's motion for judgment on the pleadings and plaintiffs' motion for summary judgment.