72 N.Y.2d 11 (1988)
Rosalind S. Wells, Respondent,
v.
Shearson Lehman/American Express, Inc., et al., Appellants.
Court of Appeals of the State of New York.
Argued April 20, 1988.
Decided June 7, 1988.
Leon P. Gold, Mark E. Davidson and Clifford Thau for appellants.
Sidney B. Silverman, Joan T. Harnes, Harold B. Obstfeld and Nancy A. Lester for respondent.
Judges SIMONS, ALEXANDER, TITONE and HANCOCK, JR., concur with Judge KAYE; Judge BELLACOSA dissents and votes to affirm in a separate opinion; Chief Judge WACHTLER taking no part.
*14 KAYE, J.
An action against financial advisors who rendered opinions on the financial fairness to shareholders of a proposed leveraged buyout is barred by a release in settlement of a prior Delaware class action challenging the buyout. While the financial advisors were not parties to the Delaware class action, we conclude that, applying the law of Delaware or the law of New York, the release discharging the named defendants, their "agents * * * representatives * * * or anyone else", unambiguously precluded the pending action.

I.
Plaintiff, Rosalind Wells, brings this action against Shearson Lehman/American Express, Inc. and Bear Stearns & Co., alleging that their opinions as to the financial fairness of the consideration offered Wells and other shareholders of Metromedia, Inc. in a management buyout were wrong and negligently or recklessly rendered. She contends that the consideration was grossly inadequate and that the board and shareholders approved the transaction in reliance on defendants' opinions. The question whether these claims are precluded by the settlement of a prior class action is best considered against the background of the buyout and prior litigation.
On December 6, 1983, four senior officers of Metromedia proposed a leveraged buyout in which the company would be taken private through a merger with JWK Acquisition Corp. The officers would own approximately 96% of the stock of the merged company. The offer would have converted each share of Metromedia common stock into a combination of cash and subordinated debentures worth approximately $40. The total purchase price of $1.1 billion was to be obtained through loans secured by Metromedia's assets.

*15 The Delaware Class Action
Plaintiff and other Metromedia stockholders immediately began lawsuits in Delaware Chancery Court challenging the proposed transaction; by December 30, nine suits had been filed. An amended class action complaint, consolidating those separate actions, was served and filed naming as defendants Metromedia, its directors and Boston Ventures Ltd., and attacking the amount to be paid to public shareholders as grossly inadequate. The following extract from the complaint is illustrative: "The intrinsic value of Metromedia's common stock is materially in excess of the value of the proposed consideration, taking into account Metromedia's assets, the underlying strength of its business, and its earnings power. If the assets of Metromedia were sold, in whole or in part, the public shareholders could realize an amount substantially in excess of the proposed consideration under the going-private plan."
Four Metromedia directors who, though named in the complaint, were not part of the buying group, were appointed to a special directors committee to represent the interests of the common stockholders. The directors committee retained defendant financial advisors to render opinions on the financial fairness of the buyout to public stockholders. On January 31, 1984, defendants informed the committee that, based on facts then known, the offered price per share was fair, and the transaction was thereafter approved. It is these opinions that plaintiff now challenges.
The accuracy of defendants' opinions was the subject of significant attention in the Delaware class action.
Eleven law firms represented the plaintiff class. Discovery proceeded during the spring of 1984  including the depositions of partners of both financial advisors  and negotiations culminated in settlement. Defendants increased the consideration offered to shareholders by $16,500,000 (or approximately 69 cents a share) and agreed to pay the plaintiffs' attorneys' fees of close to $1 million.

The Settlement and Release
A stipulation of settlement (the release) dated May 15, 1984 recited the underlying allegations of the complaint, and represented that plaintiffs' attorneys had made a "thorough and intensive" investigation into those claims and determined that *16 the proposed settlement was fair and reasonable. The release provided that: "all claims * * * that have been or could have been asserted by plaintiffs herein or any members of the Class against any defendant, or against any of the officers, directors, agents, attorneys, representatives, affiliates and general and limited partners of any defendant, or against anyone else in connection with or that arise now or hereafter out of the Action, the Settlement (except for compliance with the Settlement), or any matters, transactions or occurrences referred to in the complaint or the Stipulation, including the recitals herein (the `Settled Claims') shall be compromised, settled, released and dismissed with prejudice". At two separate points, the release referred to the intention to put plaintiffs' claims regarding the buyout finally to rest.
To obtain court approval, plaintiffs' attorneys submitted a memorandum in support of the settlement and their fee application. In this memorandum, they represented that they had undertaken an extensive review of documents relating to Metromedia's financial position and asset values, including confidential materials, and had conducted several depositions from which they derived a complete picture of all the parties' positions. They discovered, and revealed, "facts that cast doubt on the `independence' of [Shearson]" (including the fee arrangement); the weaknesses in both opinions indicating that they had undervalued Metromedia's assets; and the lender's determination that Metromedia's broadcast assets alone were sufficient to justify the loan for the buyout, indicating that the company's other assets were undervalued. Counsel concluded, however, that there was a risk the future profitability might not materialize, and plaintiffs might not be able to meet their burden of proof if the suit continued to trial.
A notice of pendency dated May 21, 1984 was distributed to the class together with the proposed release and the statement prepared by Metromedia in connection with the required shareholder vote on the merger. The proxy statement, reviewed by plaintiffs' counsel in draft and modified form, included the written opinions of both defendants that the price offered the shareholders "approximated the estimated per share value of Metromedia which might be realized from the sale of its various businesses as going concerns, including estimated costs and risks associated with such liquidation." The proxy statement also outlined the relationships and financial arrangements between Metromedia and the financial advisors, including the fact that both would receive substantial *17 fees if the merger went forward. The stockholders approved the merger and it became effective on June 21, 1984.
On that same date the Delaware court entered final judgment approving the settlement as "fair, reasonable and adequate," dismissing the action on the merits with prejudice, and providing: "All plaintiffs and all members of the certified class are hereby permanently barred and enjoined from instituting or prosecuting, either directly or representatively, or in any other capacity, any other action asserting claims against anyone which could have been asserted in the Action or which arise now or hereafter out of the Action, the Settlement * * * or any matters, transactions or occurrences referred to in the pleadings in the Action or the Stipulation".
In May 1985, Metromedia made an agreement to sell seven of its television stations for $2 billion. The remaining businesses then were sold in accordance with a plan of liquidation adopted in February 1986 for an additional $2.5 billion, the total consideration far exceeding the $1.1 billion value established as fair by defendants.

The Present Action
Immediately, plaintiff instituted the present action seeking damages and other relief against the financial advisors on behalf of a class of Metromedia stockholders whose shares were exchanged in the merger. The complaint repeats the Delaware allegations, and charges that defendants violated their duty to the shareholders, knowing that the opinions would be relied on by the shareholders and that the merger would not otherwise proceed. In response to defendants' motion to dismiss on several grounds, including the prior release and failure to state a cause of action, plaintiff submitted an affidavit stating: "It was never my intention to release [the financial advisors] from any liability for professional malpractice in the issuance of their opinions, nor did I even suspect that such malpractice had occurred or would occur."
Supreme Court granted defendants' motion to dismiss the complaint, holding that the action was barred by the release, which expressed the parties' clear intention to foreclose any action arising out of the buyout. The court further held that the complaint failed to state a cause of action because plaintiff could not establish reliance on defendants' opinions, and that any claim for losses arising out of reliance on the reports is an issue for the Delaware court that approved the settlement. *18 The Appellate Division reversed, reasoning that under both Delaware and New York law the intent of the parties to a general release that purports to discharge "anyone else" must be examined to determine whether particular individuals were meant to be included. The court additionally held that, because the investment bankers were retained to advise the shareholders, allegations that the shareholders relied on their opinions to their detriment stated a cause of action. We now reverse.

II.
The effect of the release is central to this appeal. If language barring claims against the settling defendants' "agents * * * representatives * * * or against anyone else" applies to the financial advisors, we need not consider any other issues raised by the parties. This central issue calls upon us to determine whether the applicable law requires that a release designate parties specifically, and whether a release containing the general language before us is inherently ambiguous, so that other evidence must be examined to determine whom the parties intended to release. We answer both questions in the negative.
Plaintiff contends that as a threshold matter we should determine whether Delaware or New York law governs the issue (see, Schultz v Boy Scouts, 65 N.Y.2d 189; Babcock v Jackson, 12 N.Y.2d 473). Because the same result is reached under both, we need not apply conflict of law principles to choose between them.
At common law, release of one joint tort-feasor automatically released all. In the eyes of the law, there was but one cause of action, and it was surrendered upon the discharge of one joint tort-feasor (see generally, Prosser and Keeton, Torts § 49, at 332 [5th ed]). That extreme rule was widely assailed as lacking historical justification, working great unfairness in particular cases, and impeding settlements in general, and as a result it has been largely abrogated. The Uniform Contribution Among Tortfeasors Act, for example  adopted in some form by 18 States  specifies that a release given to one joint tort-feasor does not discharge the others "unless its terms so provide" (12 ULA § 4 [Master ed]).
The issue before us poses another extreme: plaintiff urges that settling parties can never discharge persons unless they are specifically named or identified, that a general release of *19 "anyone else" is necessarily ambiguous, requiring extrinsic evidence of intent. While we recognize that a few States have so held (see, e.g., Alsup v Firestone Tire & Rubber Co., 101 Ill 2d 196, 461 NE2d 361; Bjork v Chrysler Corp., 702 P2d 146 [Wyo]), we conclude that this is not the law of Delaware or New York.
Neither the Delaware statute (10 Del Code Annot § 6304 [a]) nor the New York statute (General Obligations Law § 15-108 [a]) says in so many words that a release must specifically name or identify the persons to be discharged; the Legislatures could easily have so provided if that was their intention. We conclude that such specificity is not required. As with contracts generally, the courts must look to the language of a release  the words used by the parties  to determine their intent, resorting to extrinsic evidence only when the court concludes as a matter of law that the contract is ambiguous (see, e.g., Van Wagner Adv. Corp. v S & M Enters., 67 N.Y.2d 186, 191; West, Weir & Bartel v Carter Paint Co., 25 N.Y.2d 535, 540, mod 26 N.Y.2d 969; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 N.Y.2d 285, 291). Here, the release is clear, unambiguous, and obviously meant to include defendants.

The Delaware Statute
The Delaware statute (a version of the Uniform Contribution Among Tortfeasors Act, 10 Del Code Annot § 6304 [a]), provides: "A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tort-feasor unless the release so provides".
We find instructive the only decision of the Delaware Supreme Court dealing with the issues before us. In Chakov v Outboard Mar. Corp. (429 A2d 984 [Del]), the Delaware Supreme Court concluded that a general release discharging "all other persons, firms or corporations liable or who might be claimed to be liable" was effective to discharge a nonparty manufacturer; specificity was not required. Nor did the court hold that the release necessarily was ambiguous.
Delaware Superior Court had found that the release clearly discharged the manufacturer, who was not a party to the release, and that parol evidence was inadmissible. The Supreme Court affirmed en banc, concluding that, even assuming ambiguity and examining the extrinsic evidence, there was no genuine issue of fact as to the parties' intent. The court wrote: *20 "we see no legal reason why an injured party cannot give a general release, including a release of third parties strangers to the contract, under circumstances shown here * * * As the Court below noted, our Courts proceed by looking to the language of the release". (429 A2d, supra, at 985.) The court further noted the "potential for confusion in general releases referring to `other persons, firms or corporations.' Such releases might, in given circumstances, reasonably be read as referring only to third party entities related to the contracting party obtaining the release. This is especially true when the release purports to speak for such third parties by denying any liability to the claimant." (Id., at 985-986.)
Instead of Chakov, the Appellate Division relied on Sellon v General Motors Corp. (521 F Supp 978 [Del]), a decision of the Federal District Court, for the proposition that Delaware requires inquiry into the intent of the parties to every release containing general language. That reliance is misplaced.
Without directly addressing the question whether the statute requires released parties to be named or specifically identified, the District Judge in Sellon considered the effect of language discharging third-party defendant and her "agents, servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships." As the opinion indicates, Delaware courts may be reluctant to apply the plain meaning rule to exclude evidence of intent when someone who was not a party to a release seeks the benefit of its general language, but only if the language of the release reveals confusion about which entities were being discharged will extrinsic evidence of the parties' intent be admissible. (Sellon v General Motors Corp., 521 F Supp, at 983, supra.) Confusion justifying factual inquiry may exist when a release discharging "all other persons" includes a denial of liability on the part of "parties hereby released," because such a denial could not be made on behalf of the unknown persons purportedly released. This ambiguity, "which might otherwise appear slight," may justify admission of extrinsic evidence. (Sellon v General Motors Corp., 521 F Supp, at 984, supra.)
From the statute and cases, we conclude that Delaware neither requires absolute specificity nor deems every general, nonspecific release inherently ambiguous.

The New York Statute
We reach that same conclusion under New York law. The *21 General Obligations Law § 15-108 (a) provides: "When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide".
While we have not previously considered the impact of this statute on nonspecific general releases, we did prior to its enactment hold in an analogous situation that extrinsic evidence of the intent of parties to a general release was inadmissible (Oxford Commercial Corp. v Landau, 12 N.Y.2d 362).
Plaintiff corporation in Oxford discovered that a director had been siphoning off corporate assets for his own businesses. The director agreed to make payments to satisfy the claims against him and the corporation released him, agreeing not to bring "any suit, against any person whomsoever" except those specifically named. Oxford then commenced a suit against its accountants for aiding and abetting the director. The court upheld the award of summary judgment to the accountants, ruling that extrinsic evidence was inadmissible and that defendants were covered by the release: "[T]he plaintiff corporation's promise, contained in an integrated agreement reached after lawyer-guided negotiations and containing provisions quite unlike the stereotyped verbiage found in the usual standard general release, permits no conclusion other than that the plaintiff intended to release every one who participated in the Carlin transactions except the parties expressly excluded." (12 NY2d, at 366, supra.)
The case before us is like Oxford; the only question is whether General Obligations Law § 15-108 (a) compels a different result. Neither the language nor the legislative history of the statute supports plaintiff's contention that a release of one joint tort-feasor cannot unambiguously discharge other parties unless named or specifically identified in it. The plain meaning of the statute is that a release must expressly indicate that it discharges parties in addition to those who contracted for the release. The reading urged by the plaintiff would make it impossible for a claimant conclusively to release all tort-feasors, and have an end to a dispute, if any of them remained unknown.
Our reading of the statute comports with the intent reflected *22 in the legislative history. The purpose of section 15-108 (a) was to abrogate the common-law rule that a release given one joint tort-feasor discharges all other joint tort-feasors (see, Attorney-General's Mem to Governor, Bill Jacket, L 1972, ch 830). The bill was introduced on the recommendation of the Law Revision Commission, which submitted a report to the Legislature explaining the rationale and effect of the bill: "The [common-law] rule sets a trap for the average man, who quite reasonably assumes that settling his claim with one person does not have any effect on his rights against others with whom he did not deal. At present it is necessary for the claimant to make an express disclaimer in his release of any intent to release persons other than those named in it. It is more in accord with common understanding to provide that the release means just what it says; if it does not purport to release a party by its express terms, it should not affect his liability." (1972 Report of NY Law Rev Commn, 1972 NY Legis Doc No 65 [K], 1972 McKinney's Session Laws of NY, at 3237, 3239.)
The intended effect of the bill thus was to prevent the automatic release of unnamed parties by limiting the effect of a release to that of the language it contains; the bill placed no restraint on what that language could be. What it achieved was a requirement that a release not discharge "everyone" or "anyone" without saying so. In effect, "other tortfeasors are not to be beneficiaries of a general release or covenant not to sue unless the releasor indicates a clear intention to do so by the inclusion of an express term to that effect in the document." (Association of Bar of City of NY, Committee on State Legislation, Approval Mem, Bill Jacket, L 1972, ch 830.)
We therefore conclude that neither Delaware nor New York unvaryingly demands that every discharged party be specifically named or identified. Nor is a release of "anyone else" in every instance necessarily ambiguous.

Application of the Law to the Release
The release before us facially satisfies the Delaware and New York statutes in that its terms do expressly provide for the release of persons other than the named defendants in the class action. The release expressly provides for the discharge of claims against all named defendants; against their officers, directors, agents, attorneys, representatives, affiliates and general and limited partners; as well as against anyone else in *23 connection with the buyout. Plaintiff had to have known, from the face of this release, that she was discharging first, the named defendants; second, an identified group of persons related to them; and third, "anyone else" for claims connected to or arising out of the buyout. Plaintiff thus is plainly not in the position of the hapless common-law releasor, trapped by the operation of law into automatically discharging all the world upon the intended release of but one joint tort-feasor.
Inquiry does not end there, however, for we must determine, as a matter of law, whether there is any ambiguity in the contract that requires extrinsic evidence of intent regarding release of the financial advisors. Ambiguity has readily been found in broad general releases, particularly printed forms in personal injury actions; there can be no question that in all actions the better practice is to avoid such questions where possible, by specifically naming or identifying all parties to be discharged. In Chakov (supra) and Sellon (supra), for example, the Delaware courts identified as a possible ambiguity the fact that a release purports to discharge unknown persons yet also denies any fault on their behalf; if their fault is denied, obviously their identity must be known. Similarly, New York Supreme Court and Appellate Division cases  while incorrectly imposing a requirement of absolute specificity  have readily identified factual questions in the circumstances of the release (Sage v Hale, 75 Misc 2d 256), and in a reading of the general release language in the context of the entire document (Spector v K-Mart Corp., 99 AD2d 605).
Here, however, there are no such factual issues. The release does not purport to deny fault for unidentified persons; no deception is alleged in the circumstances of obtaining the release; no ambiguity is raised by reading the words "anyone else" in the context of the entire document. To the contrary, the words "anyone else" in this release clearly must have referred to persons unrelated to defendants (see, Spector v K-Mart Corp., 99 AD2d 605, supra), because the related persons were already specifically identified by category; "anyone else" necessarily meant additional, other persons. By the same token, "anyone else" in this release refers not to all the world generally but is limited to a class of persons "in connection with" the events at issue. The description of the discharged parties read in context of this release makes clear that the parties' intention was to put an end to all of plaintiffs' claims relating to the buyout. The release said exactly that. At two points, the release refers to a settlement objective as the *24 desire to put plaintiffs' claims "finally to rest." In a transaction of this magnitude, it is difficult to imagine how this expressed intention could even have been accomplished without resort at some point to a catchall category.
The release in issue is a handmade document  not a standard form  that was independently negotiated as part of a complex commercial transaction in which plaintiff was represented by counsel. Indeed, 9 independent plaintiffs' actions with 11 separate counsel joined forces, complaining that the participants had failed to disclose the true value of Metromedia assets and that the consideration to be paid public shareholders was grossly inadequate. From the facts and documents referred to in the release  particularly the complaint, depositions and the proxy statement  it was plain that the financial advisors had performed essential services, and were principal actors in the relevant events; they are not remote strangers to the parties or events at issue in Delaware. This case thus cannot be analogized to all-inclusive boilerplate language found in printed release forms terminating personal injury actions as to unknown third parties, where the result might well be different.
Finally, the Appellate Division identified no ambiguity in this release; despite lengthy submissions, neither plaintiff nor the dissent can identify any real ambiguity in this release.[*] Plaintiff simply insists that her subjective intent not to release defendants creates an issue of fact that requires extrinsic evidence. But no manifestation of this alleged intent was made to anyone when the parties entered into the release. Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none.
Affirmance here would be tantamount to the adoption of an inflexible rule that every release must invariably specify every party to be discharged or the transaction will be at risk of *25 later unraveling; that however sophisticated the matter, however informed and counseled the plaintiff, and however plain the words and purport of the document, there could never be a release that truly put an end to a disputed commercial transaction. We do not believe that is what the Legislature of Delaware or New York intended, or the law requires. We do believe that our construction of the statutes implements the legislative will and carries forward the legislative purpose by remedying the evil of the harsh common-law rule; that it eliminates the potential unfairness of one unbending rule without substituting the potential unfairness of a new one; and that it thereby serves the interests of all members of the public by allowing them to put their disputes finally to rest when they so desire and so provide.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendants' motion to dismiss the complaint granted and the certified question answered in the negative.
BELLACOSA, J. (dissenting).
I respectfully disagree with the majority's analysis and conclusion that the release in a prior Delaware action discharges defendant financial advisors from liability for professional malpractice to plaintiff shareholder in this action. The defendants here were not "expressly" named or otherwise identified in any manner, even by functional category, in the release, and they were not parties to the prior action; yet, they were fully known to all parties as essential participants in the corporate transaction.
In my view, under either New York or Delaware law requiring specificity, a clause purporting to release "anyone else", at the very least is facially ambiguous barring summary judgment and necessitating extrinsic evidence to establish whether unnamed or otherwise unidentified parties were intended to be discharged. Courts are not able on this record to resolve this ambiguity as a matter of law, and thus I dissent and vote to affirm the Appellate Division's denial of the motion to dismiss and would answer the certified question in the affirmative. The contrary holding of the majority contradicts and undermines General Obligations Law § 15-108, enacted to protect unwary releasors from unintended legal traps. This release set a sophisticated corporate financial trap and the court now snaps it shut, despite the statute.
In 1983, the management of a publicly held corporation, Metromedia, Inc., proposed a buyout. JWK Acquisition Corp., *26 a company the Metromedia management had organized, was to merge with Metromedia. The result was to be that Metromedia would be converted into a private corporation. A buy-out price of $40 per share was offered, based on an estimated $1.1 billion worth of the corporation's assets. The proposal triggered a class action lawsuit in Delaware by common shareholders charging the management with a breach of fiduciary duty for using Metromedia's assets to convert the company to their own interests. The suit charged that management had underestimated the worth of this publicly held corporation in setting the proposed purchase price at $40 per share.
Two investment banking firms, Shearson Lehman/American Express, Inc. and Bear, Stearns & Co., the defendants in the instant action, were retained by management to render specialized professional financial advice as to whether the proposed merger was fair to the common shareholders. The investment bankers agreed with management's estimation that the company's assets were worth $1.1 billion and, consequently, reported that the buy-out price was fair. The common shareholders were so advised. Armed with this advice and after some negotiation, the shareholders agreed to settle the Delaware action at an agreed-upon price of an additional 69 cents per share. As part of the stipulation of settlement, the plaintiff shareholders signed the release at issue here which discharged "all claims * * * that have been or could have been asserted by plaintiffs * * * against any defendant, or against any of the officers, directors, agents, attorneys, representatives, affiliates and general and limited partners of any defendant or against anyone else". The Delaware court approved the settlement in June 1984, and shortly thereafter the shareholders approved the merger.
Over the next two years, the "new" privately held Metromedia sold off its assets, including seven television stations and several radio stations and other businesses. By July 1986 when the last business was sold, the aggregate consideration received for all of Metromedia's businesses was not the $1.1 billion estimated by defendants and upon which the shareholders relied in settling their claims and in approving the merger. Rather, $4.5 billion was recouped for the new owners, reflecting a "miscalculation" by defendants of more than 300% or $3.4 billion. On the pure mathematical formula originally used to value the shares, that should have amounted to perhaps $84 per share more for the shareholders.
*27 In the face of the enormous personal profits reaped by Metromedia's management in the sale of the corporate assets at the expense of the shareholders, plaintiff Wells, a former shareholder and a plaintiff in the Delaware action, instituted this action in New York against Shearson Lehman/American Express, Inc. and Bear, Stearns & Co., charging professional malpractice in evaluating the worth of the corporation and in advising that the buy-out price of $40 per share was fair. Defendants essentially contend they fall within the "anyone else" clause and are thus shielded from any liability arising out of the Metromedia buyout.
We are unanimous that under common law a release given by an injured party to one tort-feasor discharged all others unless the releasor specifically stated a clear intention not to release a certain party. The common-law rule was abrogated by statute in both New York and Delaware via adoption of the Uniform Contribution Among Tortfeasors Act (New York General Obligations Law § 15-108; Del Code Annot, tit 10, § 6304 [a]). The central protective purpose of the Uniform Act is to invert the common-law rule so that other tort-feasors are not released unless the releasor expresses a clear intention to do so by express reference rather than by operation of law or by legal implication or interpretation.
The issue for us is simply whether the general term "anyone else" is ambiguous so as to bar summary judgment and to necessitate extrinsic evidence, at least as to whether the parties' intent in the subject release is sufficiently expressed in accordance with the protective letter and spirit of General Obligations Law § 15-108; and, if so, whether the record in this case supplies extrinsic evidence, as it did in Chakov v Outboard Mar. Corp. (429 A2d 984 [Del]).
In my view, the use of the term "anyone else" in this case renders the release ambiguous as to its application to unnamed persons and to functional classes under either New York or Delaware law. The record in this litigation is incomplete and insufficient on the issue of intent in direct contradistinction to the statutes and to the Chakov analysis (supra). This should bar summary judgment to defendants in this case.
The New York version of the statute (General Obligations Law § 15-108 [a]) provides, "a release * * * given to one of two or more persons liable * * * in tort * * * does not discharge any of the other tortfeasors from liability * * * unless its terms expressly so provide" (emphasis added).
*28 The lean words of the statute are cogent and clear. They require the releasor to "expressly" designate by name or at least by some recognizable and specific description those other tort-feasors intended to be released. The majority's strained construction of this remedial statute functionally nullifies the purpose of the statute and impermissibly excises the word "expressly" from the statute.
Support for the plain reading of the statute is readily available in the full legislative history of the statute. The Statutory Note to the 1972 amendment provides: The "purpose is to remove the uncertainty reflected in court decisions concerning the rule that a general release given to one joint tortfeasor discharges all others, and to eliminate the inequities of the present rule by providing that such a release will discharge only the persons and liabilities expressly referred to therein" (see, Historical Note of Commission, McKinney's Cons Law of NY, Book 23A, General Obligations Law § 15-108, at 717 [emphasis added]). The majority's construction of this statute reintroduces uncertainty and inequity.
Further support for this construction of the statute is supplied by the Law Revision Commission, the drafters of the very statutory language at issue and upon whose recommendation the legislation was adopted. "This bill simply provides that when a person signs a general release, he releases only the person or persons and the liabilities named therein," (Mem of Assistant Executive Director of Law Revision Commission, Governor's Bill Jacket, L 1972, ch 830 [emphasis added]). The nebulous and humongous "anyone else" in this case surely fails that test.
The New York County Lawyers' Association also urged legislative and gubernatorial approval of the measure, noting, "This amendment makes it clear that only the tortfeasors that are named are released [emphasis added]", and the Association of the Bar of the City of New York commented that under the proposed legislation "other tortfeasors are not to be the beneficiaries of a general release or covenant not to sue unless the releasor indicates a clear intention to do so by the inclusion of an express term to that effect in the document [emphasis added]" (see, Mem of New York County Lawyers' Assn, Governor's Bill Jacket, L 1972, ch 830; see also, Letter to Governor's Counsel from Association of Bar of City of NY, Committee on State Legislation, Governor's Bill Jacket, L 1972, ch 830).
*29 In sum, the majority's rendition of the statute in this case is interdicted by the statute, transports the law back to where it was before the statute was enacted, and unnecessarily imposes an unfairness on the more vulnerable participants.
This is demonstrated even by the majority's reliance on Oxford Commercial Corp. v Landau (12 N.Y.2d 362), a case which it acknowledges as predating the statute. In that case, the subject release contained an agreement not to sue "any person whomsoever" except those specifically named. The court, applying the harsh common-law rule, held that because the defendants were not specifically named, they were discharged under the release. The majority refers to and relies upon the case as though the statute had never happened. However, New York law has come a long way in attempting to protect the investing public from financial wizards and manipulators  at least it should have.
Likewise, the Delaware version of the Uniform Act provides: "A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasor unless the release so provides" (Del Code Annot, tit 10, § 6304 [a]).
The leading cases construing the Delaware statute and providing useful guideposts here are a Delaware Supreme Court case, Chakov v Outboard Mar. Corp. (429 A2d 984, supra) and a Federal District Court case, Sellon v General Motors Corp. (521 F Supp 978 [US Dist Ct, Del]), which relied on Chakov. In both, the courts were called upon to determine on summary judgment motions whether a release employing the general term "all other persons, firms or corporations" released the defendants who were not specifically named in the release. In both cases, the courts looked to the language of the release and the course of negotiations leading up to the respective releases to determine whether the parties had manifested a clear intent that the release embrace the tort-feasor then seeking its protection. The rules which emerged were that if upon review of the motion papers there was conclusive extrinsic evidence establishing a clear intent to release the unnamed parties, then summary judgment may be granted; if, on the other hand, no clear intent could be gleaned from the language of the release itself or coupled with consideration of the course of negotiations, then a genuine issue of fact exists and summary judgment should be denied (see, Sellon v General Motors Corp., 521 F Supp, supra, at 986; *30 Chakov v Outboard Mar. Corp., 429 A2d, supra, at 985-986). The key distinction in result and analysis between Chakov and Sellon is that in Chakov, the extrinsic evidence relating to the "course of negotiations" clearly established the parties' intent with respect to the release. Indeed, the parties in Chakov (supra, at 986) stipulated "that the record on the question of intention [was] complete". In the instant case, we have no evidence and no idea what the plaintiffs' intent was in respect to the nondefendants (defendants here) in the predicate Delaware class action who played a sophisticated fiduciary role in what turned out to be a bonanza for corporate management against the interests of the shareholders.
In Sellon, interestingly, the court, after examining the language of the release as well as the course of negotiations, found the record inadequate to support a ruling on the intended scope of the release and concluded that there was a genuine issue of material fact, thus precluding a grant of summary judgment. Yet, the Delaware statute does not even have the extra "kicker" of the New York statute calling for "express" references.
Applying this analysis and history to the instant case, and bearing in mind that plaintiff is entitled to the benefits of all reasonable inferences as to the pleadings, I conclude that the Appellate Division correctly reversed the trial court's grant of relief to defendants. I would not summarily grant relief to plaintiff either, but would deny as to both as the Appellate Division did. The language of the release, when viewed in the context of what the record discloses of the negotiation process and the participation by defendants in this action, fails to establish as a matter of law plaintiff's intent to release the financial advisors from potential professional malpractice liability. Their fiduciary role and conflicted allegiance is so suspect as to render the likelihood of such intent highly doubtful, but both sides should be afforded the opportunity to present proof at a trial. That is all I would decide and certainly would not erect either directly or by precedential implication some unsettling and unbending rule of law. It always lays in the hands of the participants to simply and clearly express their intentions in accordance with the remedial statute.
Moreover, an examination of the course of negotiations in this case does not clear up the ambiguity created by the language of the release itself. This record already contains *31 significant extrinsic evidence in favor of plaintiff's contention that she never intended the release to discharge these defendants. Notably, while the release itself fails to single out "experts" or "advisors" in its litany of those released as the statute requires, those categories were expressly identified and employed in a different part of the settlement agreement in which these very defendants sought to escape liability for certain fees and expenses. That contextual clash alone creates an ambiguity about this release instrument under this statute in this case.
The irony is startling. The statute requires an express listing and there is none. The release contains no express listing when names, active participants and functional categories of persons in the underlying financial transaction  all well known at the time the release was drawn  could have been easily inserted and even were in other parts of the release. Yet, those now escaping liability despite the important consumer, public protection statute, who were in the best position to protect themselves in the first instance and had excellent legal advisers available to draft a statutorily conforming instrument, instead are additionally rewarded with an overly generous statutory interpretation which, as to these parties and as to all others from now on, nullifies the whole purpose of the statute.
I vote to affirm.
Order reversed, etc.
NOTES
[*] Both plaintiff and the dissent light on the same single alleged ambiguity in the release: as part of the release defendants agreed to bear certain of plaintiffs' costs and except as provided, to bear no other costs incurred by any plaintiff, class member, their "attorneys, experts, advisers, agents or representatives." No ambiguity is created by that reference to plaintiffs' "experts" and "advisers." It is clear from the face of the release that only the costs of the specified persons  and no one else  were to be paid by defendants. By the same token, it is clear from the face of the release that plaintiffs' claims against the specified persons as well as "anyone else" in connection with the transaction were to be finally put to rest by the settlement.