OPINION OF THE COURT
Kaye, J.
An action against financial advisors who rendered opinions on the financial fairness to shareholders of a proposed leveraged buyout is barred by a release in settlement of a prior Delaware class action challenging the buyout. While the financial advisors were not parties to the Delaware class action, we conclude that, applying the law of Delaware or the law of New York, the release discharging the named defendants, their "agents * * * representatives * * * or anyone else”, unambiguously precluded the pending action.
I.
Plaintiff, Rosalind Wells, brings this action against Shear-son Lehman/American Express, Inc. and Bear Stearns & Co., alleging that their opinions as to the financial fairness of the consideration offered Wells and other shareholders of Metromedia, Inc. in a management buyout were wrong and negligently or recklessly rendered. She contends that the consideration was grossly inadequate and that the board and shareholders approved the transaction in reliance on defendants’ opinions. The question whether these claims are precluded by the settlement of a prior class action is best considered against the background of the buyout and prior litigation.
On December 6, 1983, four senior officers of Metromedia proposed a leveraged buyout in which the company would be taken private through a merger with JWK Acquisition Corp. The officers would own approximately 96% of the stock of the merged company. The offer would have converted each share of Metromedia common stock into a combination of cash and subordinated debentures worth approximately $40. The total purchase price of $1.1 billion was to be obtained through loans secured by Metromedia’s assets.
*15 The Delaware Class Action
Plaintiff and other Metromedia stockholders immediately began lawsuits in Delaware Chancery Court challenging the proposed transaction; by December 30, nine suits had been filed. An amended class action complaint, consolidating those separate actions, was served and filed naming as defendants Metromedia, its directors and Boston Ventures Ltd., and attacking the amount to be paid to public shareholders as grossly inadequate. The following extract from the complaint is illustrative: "The intrinsic value of Metromedia’s common stock is materially in excess of the value of the proposed consideration, taking into account Metromedia’s assets, the underlying strength of its business, and its earnings power. If the assets of Metromedia were sold, in whole or in part, the public shareholders could realize an amount substantially in excess of the proposed consideration under the going-private plan.”
Four Metromedia directors who, though named in the complaint, were not part of the buying group, were appointed to a special directors committee to represent the interests of the common stockholders. The directors committee retained defendant financial advisors to render opinions on the financial fairness of the buyout to public stockholders. On January 31, 1984, defendants informed the committee that, based on facts then known, the offered price per share was fair, and the transaction was thereafter approved. It is these opinions that plaintiff now challenges.
The accuracy of defendants’ opinions was the subject of significant attention in the Delaware class action.
Eleven law firms represented the plaintiff class. Discovery proceeded during the spring of 1984 — including the depositions of partners of both financial advisors — and negotiations culminated in settlement. Defendants increased the consideration offered to shareholders by $16,500,000 (or approximately 69 cents a share) and agreed to pay the plaintiffs’ attorneys’ fees of close to $1 million.
The Settlement and Release
A stipulation of settlement (the release) dated May 15, 1984 recited the underlying allegations of the complaint, and represented that plaintiffs’ attorneys had made a "thorough and intensive” investigation into those claims and determined that *16 the proposed settlement was fair and reasonable. The release provided that: "all claims * * * that have been or could have been asserted by plaintiffs herein or any members of the Class against any defendant, or against any of the officers, directors, agents, attorneys, representatives, affiliates and general and limited partners of any defendant, or against anyone else in connection with or that arise now or hereafter out of the Action, the Settlement (except for compliance with the Settlement), or any matters, transactions or occurrences referred to in the complaint or the Stipulation, including the recitals herein (the 'Settled Claims’) shall be compromised, settled, released and dismissed with prejudice”. At two separate points, the release referred to the intention to put plaintiffs’ claims regarding the buyout finally to rest.
To obtain court approval, plaintiffs’ attorneys submitted a memorandum in support of the settlement and their fee application. In this memorandum, they represented that they had undertaken an extensive review of documents relating to Metromedia’s financial position and asset values, including confidential materials, and had conducted several depositions from which they derived a complete picture of all the parties’ positions. They discovered, and revealed, "facts that cast doubt on the 'independence’ of [Shearson]” (including the fee arrangement); the weaknesses in both opinions indicating that they had undervalued Metromedia’s assets; and the lender’s determination that Metromedia’s broadcast assets alone were sufficient to justify the loan for the buyout, indicating that the company’s other assets were undervalued. Counsel concluded, however, that there was a risk the future profitability might not materialize, and plaintiffs might not be able to meet their burden of proof if the suit continued to trial.
A notice of pendency dated May 21, 1984 was distributed to the class together with the proposed release and the statement prepared by Metromedia in connection with the required shareholder vote on the merger. The proxy statement, reviewed by plaintiffs’ counsel in draft and modified form, included the written opinions of both defendants that the price offered the shareholders "approximated the estimated per share value of Metromedia which might be realized from the sale of its various businesses as going concerns, including estimated costs and risks associated with such liquidation.” The proxy statement also outlined the relationships and financial arrangements between Metromedia and the financial advisors, including the fact that both would receive substan *17 tial fees if the merger went forward. The stockholders approved the merger and it became effective on June 21,1984.
On that same date the Delaware court entered final judgment approving the settlement as "fair, reasonable and adequate,” dismissing the action on the merits with prejudice, and providing: "All plaintiffs and all members of the certified class are hereby permanently barred and enjoined from instituting or prosecuting, either directly or representatively, or in any other capacity, any other action asserting claims against anyone which could have been asserted in the Action or which arise now or hereafter out of the Action, the Settlement * * * or any matters, transactions or occurrences referred to in the pleadings in the Action or the Stipulation”.
In May 1985, Metromedia made an agreement to sell seven of its television stations for $2 billion. The remaining businesses then were sold in accordance with a plan of liquidation adopted in February 1986 for an additional $2.5 billion, the total consideration far exceeding the $1.1 billion value established as fair by defendants.
The Present Action
Immediately, plaintiff instituted the present action seeking damages and other relief against the financial advisors on behalf of a class of Metromedia stockholders whose shares were exchanged in the merger. The complaint repeats the Delaware allegations, and charges that defendants violated their duty to the shareholders, knowing that the opinions would be relied on by the shareholders and that the merger would not otherwise proceed. In response to defendants’ motion to dismiss on several grounds, including the prior release and failure to state a cause of action, plaintiff submitted an affidavit stating: "It was never my intention to release [the financial advisors] from any liability for professional malpractice in the issuance of their opinions, nor did I even suspect that such malpractice had occurred or would occur.”
Supreme Court granted defendants’ motion to dismiss the complaint, holding that the action was barred by the release, which expressed the parties’ clear intention to foreclose any action arising out of the buyout. The court further held that the complaint failed to state a cause of action because plaintiff could not establish reliance on defendants’ opinions, and that any claim for losses arising out of reliance on the reports is an issue for the Delaware court that approved the settlement. *18 The Appellate Division reversed, reasoning that under both Delaware and New York law the intent of the parties to a general release that purports to discharge "anyone else” must be examined to determine whether particular individuals were meant to be included. The court additionally held that, because the investment bankers were retained to advise the shareholders, allegations that the shareholders relied on their opinions to their detriment stated a cause of action. We now reverse.
II.
The effect of the release is central to this appeal. If language barring claims against the settling defendants’ "agents * * * representatives * * * or against anyone else” applies to the financial advisors, we need not consider any other issues raised by the parties. This central issue calls upon us to determine whether the applicable law requires that a release designate parties specifically, and whether a release containing the general language before us is inherently ambiguous, so that other evidence must be examined to determine whom the parties intended to release. We answer both questions in the negative.
Plaintiff contends that as a threshold matter we should determine whether Delaware or New York law governs the issue (see, Schultz v Boy Scouts, 65 NY2d 189; Babcock v Jackson, 12 NY2d 473). Because the same result is reached under both, we need not apply conflict of law principles to choose between them.
At common law, release of one joint tort-feasor automatically released all. In the eyes of the law, there was but one cause of action, and it was surrendered upon the discharge of one joint tort-feasor (see generally, Prosser and Keeton, Torts § 49, at 332 [5th ed]). That extreme rule was widely assailed as lacking historical justification, working great unfairness in particular cases, and impeding settlements in general, and as a result it has been largely abrogated. The Uniform Contribution Among Tortfeasors Act, for example — adopted in some form by 18 States — specifies that a release given to one joint tort-feasor does not discharge the others "unless its terms so provide” (12 ULA § 4 [Master ed]).
The issue before us poses another extreme: plaintiff urges that settling parties can never discharge persons unless they are specifically named or identified, that a general release of *19 "anyone else” is necessarily ambiguous, requiring extrinsic evidence of intent. While we recognize that a few States have so held (see, e.g., Alsup v Firestone Tire & Rubber Co., 101 Ill 2d 196, 461 NE2d 361; Bjork v Chrysler Corp., 702 P2d 146 [Wyo]), we conclude that this is not the law of Delaware or New York.
Neither the Delaware statute (10 Del Code Annot § 6304 [a]) nor the New York statute (General Obligations Law § 15-108 [a]) says in so many words that a release must specifically name or identify the persons to be discharged; the Legislatures could easily have so provided if that was their intention. We conclude that such specificity is not required. As with contracts generally, the courts must look to the language of a release — the words used by the parties — to determine their intent, resorting to extrinsic evidence only when the court concludes as a matter of law that the contract is ambiguous (see, e.g., Van Wagner Adv. Corp. v S & M Enters., 67 NY2d 186, 191; West, Weir & Bartel v Carter Paint Co., 25 NY2d 535, 540, mod 26 NY2d 969; Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 291). Here, the release is clear, unambiguous, and obviously meant to include defendants.
The Delaware Statute
The Delaware statute (a version of the Uniform Contribution Among Tortfeasors Act, 10 Del Code Annot § 6304 [a]), provides: "A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tort-feasor unless the release so provides”.
We find instructive the only decision of the Delaware Supreme Court dealing with the issues before us. In Chakov v Outboard Mar. Corp. (429 A2d 984 [Del]), the Delaware Supreme Court concluded that a general release discharging "all other persons, firms or corporations liable or who might be claimed to be liable” was effective to discharge a nonparty manufacturer; specificity was not required. Nor did the court hold that the release necessarily was ambiguous.
Delaware Superior Court had found that the release clearly discharged the manufacturer, who was not a party to the release, and that parol evidence was inadmissible. The Supreme Court affirmed en banc, concluding that, even assuming ambiguity and examining the extrinsic evidence, there was no genuine issue of fact as to the parties’ intent. The court wrote: *20 "we see no legal reason why an injured party cannot give a general release, including a release of third parties strangers to the contract, under circumstances shown here * * * As the Court below noted, our Courts proceed by looking to the language of the release”. (429 A2d, supra, at 985.) The court further noted the "potential for confusion in general releases referring to 'other persons, firms or corporations.’ Such releases might, in given circumstances, reasonably be read as referring only to third party entities related to the contracting party obtaining the release. This is especially true when the release purports to speak for such third parties by denying any liability to the claimant.” (Id., at 985-986.)
Instead of Chakov, the Appellate Division relied on Sellon v General Motors Corp. (521 F Supp 978 [Del]), a decision of the Federal District Court, for the proposition that Delaware requires inquiry into the intent of the parties to every release containing general language. That reliance is misplaced.
Without directly addressing the question whether the statute requires released parties to be named or specifically identified, the District Judge in Sellon considered the effect of language discharging third-party defendant and her "agents, servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships.” As the opinion indicates, Delaware courts may be reluctant to apply the plain meaning rule to exclude evidence of intent when someone who was not a party to a release seeks the benefit of its general language, but only if the language of the release reveals confusion about which entities were being discharged will extrinsic evidence of the parties’ intent be admissible. (Sellon v General Motors Corp., 521 F Supp, at 983, supra.) Confusion justifying factual inquiry may exist when a release discharging "all other persons” includes a denial of liability on the part of "parties hereby released,” because such a denial could not be made on behalf of the unknown persons purportedly released. This ambiguity, "which might otherwise appear slight,” may justify admission of extrinsic evidence. (Sellon v General Motors Corp., 521 F Supp, at 984, supra.)
From the statute and cases, we conclude that Delaware neither requires absolute specificity nor deems every general, nonspecific release inherently ambiguous.
The New York Statute
We reach that same conclusion under New York law. The *21 General Obligations Law § 15-108 (a) provides: "When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide”.
While we have not previously considered the impact of this statute on nonspecific general releases, we did prior to its enactment hold in an analogous situation that extrinsic evidence of the intent of parties to a general release was inadmissible (Oxford Commercial Corp. v Landau, 12 NY2d 362).
Plaintiff corporation in Oxford discovered that a director had been siphoning off corporate assets for his own businesses. The director agreed to make payments to satisfy the claims against him and the corporation released him, agreeing not to bring "any suit, against any person whomsoever” except those specifically named. Oxford then commenced a suit against its accountants for aiding and abetting the director. The court upheld the award of summary judgment to the accountants, ruling that extrinsic evidence was inadmissible and that defendants were covered by the release: "[T]he plaintiff corporation’s promise, contained in an integrated agreement reached after lawyer-guided negotiations and containing provisions quite unlike the stereotyped verbiage found in the usual standard general release, permits no conclusion other than that the plaintiff intended to release every one who participated in the Carlin transactions except the parties expressly excluded.” (12 NY2d, at 366, supra.)
The case before us is like Oxford; the only question is whether General Obligations Law § 15-108 (a) compels a different result. Neither the language nor the legislative history of the statute supports plaintiff’s contention that a release of one joint tort-feasor cannot unambiguously discharge other parties unless named or specifically identified in it. The plain meaning of the statute is that a release must expressly indicate that it discharges parties in addition to those who contracted for the release. The reading urged by the plaintiff would make it impossible for a claimant conclusively to release all tortfeasors, and have an end to a dispute, if any of them remained unknown.
Our reading of the statute comports with the intent re- *22 fleeted in the legislative history. The purpose of section 15-108 (a) was to abrogate the common-law rule that a release given one joint tort-feasor discharges all other joint tort-feasors (see, Attorney-General’s Mem to Governor, Bill Jacket, L 1972, ch 830). The bill was introduced on the recommendation of the Law Revision Commission, which submitted a report to the Legislature explaining the rationale and effect of the bill: "The [common-law] rule sets a trap for the average man, who quite reasonably assumes that settling his claim with one person does not have any effect on his rights against others with whom he did not deal. At present it is necessary for the claimant to make an express disclaimer in his release of any intent to release persons other than those named in it. It is more in accord with common understanding to provide that the release means just what it says; if it does not purport to release a party by its express terms, it should not affect his liability.” (1972 Report of NY Law Rev Commn, 1972 NY Legis Doc No 65 [K], 1972 McKinney’s Session Laws of NY, at 3237, 3239.)
The intended effect of the bill thus was to prevent the automatic release of unnamed parties by limiting the effect of a release to that of the language it contains; the bill placed no restraint on what that language could be. What it achieved was a requirement that a release not discharge "everyone” or "anyone” without saying so. In effect, "other tortfeasors are not to be beneficiaries of a general release or covenant not to sue unless the releasor indicates a clear intention to do so by the inclusion of an express term to that effect in the document.” (Association of Bar of City of NY, Committee on State Legislation, Approval Mem, Bill Jacket, L 1972, ch 830.)
We therefore conclude that neither Delaware nor New York unvaryingly demands that every discharged party be specifically named or identified. Nor is a release of "anyone else” in every instance necessarily ambiguous.
Application of the Law to the Release
The release before us facially satisfies the Delaware and New York statutes in that its terms do expressly provide for the release of persons other than the named defendants in the class action. The release expressly provides for the discharge of claims against all named defendants; against their officers, directors, agents, attorneys, representatives, affiliates and general and limited partners; as well as against anyone else in *23 connection with the buyout. Plaintiff had to have known, from the face of this release, that she was discharging first, the named defendants; second, an identified group of persons related to them; and third, "anyone else” for claims connected to or arising out of the buyout. Plaintiff thus is plainly not in the position of the hapless common-law releasor, trapped by the operation of law into automatically discharging all the world upon the intended release of but one joint tort-feasor.
Inquiry does not end there, however, for we must determine, as a matter of law, whether there is any ambiguity in the contract that requires extrinsic evidence of intent regarding release of the financial advisors. Ambiguity has readily been found in broad general releases, particularly printed forms in personal injury actions; there can be no question that in all actions the better practice is to avoid such questions where possible, by specifically naming or identifying all parties to be discharged. In Chakov (supra) and Sellon (supra), for example, the Delaware courts identified as a possible ambiguity the fact that a release purports to discharge unknown persons yet also denies any fault on their behalf; if their fault is denied, obviously their identity must be known. Similarly, New York Supreme Court and Appellate Division cases — while incorrectly imposing a requirement of absolute specificity — have readily identified factual questions in the circumstances of the release (Sage v Hale, 75 Misc 2d 256), and in a reading of the general release language in the context of the entire document (Spector v K-Mart Corp., 99 AD2d 605).
Here, however, there are no such factual issues. The release does not purport to deny fault for unidentified persons; no deception is alleged in the circumstances of obtaining the release; no ambiguity is raised by reading the words "anyone else” in the context of the entire document. To the contrary, the words "anyone else” in this release clearly must have referred to persons unrelated to defendants (see, Spector v K-Mart Corp., 99 AD2d 605, supra), because the related persons were already specifically identified by category; "anyone else” necessarily meant additional, other persons. By the same token, "anyone else” in this release refers not to all the world generally but is limited to a class of persons "in connection with” the events at issue. The description of the discharged parties read in context of this release makes clear that the parties’ intention was to put an end to all of plaintiffs’ claims relating to the buyout. The release said exactly that. At two points, the release refers to a settlement objective as the *24 desire to put plaintiffs’ claims "finally to rest.” In a transaction of this magnitude, it is difficult to imagine how this expressed intention could even have been accomplished without resort at some point to a catchall category.
The release in issue is a handmade document — not a standard form — that was independently negotiated as part of a complex commercial transaction in which plaintiff was represented by counsel. Indeed, 9 independent plaintiffs’ actions with 11 separate counsel joined forces, complaining that the participants had failed to disclose the true value of Metromedia assets and that the consideration to be paid public shareholders was grossly inadequate. From the facts and documents referred to in the release — particularly the complaint, depositions and the proxy statement — it was plain that the financial advisors had performed essential services, and were principal actors in the relevant events; they are not remote strangers to the parties or events at issue in Delaware. This case thus cannot be analogized to all-inclusive boilerplate language found in printed release forms terminating personal injury actions as to unknown third parties, where the result might well be different.
Finally, the Appellate Division identified no ambiguity in this release; despite lengthy submissions, neither plaintiff nor the dissent can identify any real ambiguity in this release.* Plaintiff simply insists that her subjective intent not to release defendants creates an issue of fact that requires extrinsic evidence. But no manifestation of this alleged intent was made to anyone when the parties entered into the release. Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none.
Affirmance here would be tantamount to the adoption of an inflexible rule that every release must invariably specify every party to be discharged or the transaction will be at risk of *25 later unraveling; that however sophisticated the matter, however informed and counseled the plaintiff, and however plain the words and purport of the document, there could never be a release that truly put an end to a disputed commercial transaction. We do not believe that is what the Legislature of Delaware or New York intended, or the law requires. We do believe that our construction of the statutes implements the legislative will and carries forward the legislative purpose by remedying the evil of the harsh common-law rule; that it eliminates the potential unfairness of one unbending rule without substituting the potential unfairness of a new one; and that it thereby serves the interests of all members of the public by allowing them to put their disputes finally to rest when they so desire and so provide.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendants’ motion to dismiss the complaint granted and the certified question answered in the negative.

 Both plaintiff and the dissent light on the same single alleged ambiguity in the release: as part of the release defendants agreed to bear certain of plaintiffs’ costs and except as provided, to bear no other costs incurred by any plaintiff, class member, their "attorneys, experts, advisers, agents or representatives.” No ambiguity is created by that reference to plaintiffs’ "experts” and "advisers.” It is clear from the face of the release that only the costs of the specified persons — and no one else — were to be paid by defendants. By the same token, it is clear from the face of the release that plaintiffs’ claims against the specified persons as well as "anyone else” in connection with the transaction were to be finally put to rest by the settlement.