WESTFIELD FAMILY PHYSICIANS, P.C., et al., Respondents, v HEALTHNOW NEW YORK, INC., Appellant. [873 NYS2d 793]—

Appeal from an order of the Supreme Court, Chautauqua County (Timothy J. Walker, A.J.), entered December 17, 2007 in a breach of contract action. The order denied defendant's motion for summary judgment dismissing the complaints and amended complaint.

It is hereby ordered that the order so appealed from is unanimously reversed on the law without costs, the motion is granted and the complaints and amended complaint are dismissed.

Memorandum: In February 1998 defendant entered into separate contracts with plaintiffs Westfield Family Physicians, P.C. (WFP) and Robert Berke, M.D., doing business as Family Health Services (FHS), pursuant to which those plaintiffs would be members of an incentive risk pool, i.e., "a joint risk sharing agreement" (hereafter, group agreement), and thus would share in the apportionment of budget surplus and deficits. The group agreement set forth a compensation schedule and, in 1999, defendant paid FHS and WFP their shares of the annual surplus, as calculated by defendant. FHS and WFP did not object to defendant's calculation of their shares, and they accepted the payment.

In 2000, while the group agreement was still in effect, WFP's physicians entered into individual participating physician agreements (PPAs) that, inter alia, set forth compensation methods for payment and apportionment of the surplus and deficits that differed from those set forth in the group agreement. Later that same year, FHS terminated the group agreement. WFP and its individual plaintiff physicians (collectively, WFP plaintiffs) commenced an action alleging that the terms of the PPAs governed over those of the group agreement and that defendants thus owed them a specified surplus for the calendar year 2001. The

WFP plaintiffs, with the exception of plaintiff Bruce A. Barker, also commenced a second action seeking, in an amended complaint, a specified surplus for the calendar years 2003 through 2005. WFP and FHS commenced a separate action alleging that defendant owed both WFP and FHS a surplus in a specified amount for the calendar year 1999 based on the terms of the group agreement. The three actions thereafter were consolidated. We conclude that Supreme Court erred in denying defendant's motion for summary judgment dismissing "this action," i.e., the two complaints and the amended complaint.

We agree with defendant with respect to the WFP plaintiffs that the terms of the group agreement, not those of the PPAs, governed the apportionment of WFP's annual budget surplus for the years in question. It is well settled that, where parties have set forth their agreement in an unambiguous and complete document, that agreement should be enforced according to its terms (*see Uribe v Merchants Bank of N.Y.*, 91 NY2d 336, 341 [1998]; *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]). Thus, our "initial inquiry must center on whether the written contract, 'read as a whole to determine its purpose and intent' . . . , is reasonably susceptible to differing interpretations" with respect to whether the terms of the group agreement or those of the PPAs control (*Comprehensive Health Solutions v Trustco Bank, N.A.*, 277 AD2d 861, 863 [2000]).

Here, the language of the group agreement unambiguously establishes that the group agreement, not the PPAs, governs WFP's compensation, including division of any surplus. Indeed, pursuant to the terms of the group agreement, it was contemplated that the individual physicians would enter into PPAs with defendant, which would "remain in full effect except that compensation shall be pursuant to this [Group] Agreement." The group agreement further provided that, "[i]n the event of a conflict between the terms of this Agreement and the [PPAs], this Agreement shall control." Thus, although each PPA states that it supersedes prior agreements, we conclude that the PPAs do not override the clear and unambiguous language in the group agreement that it controls in the event of a conflict between the group agreement and the PPAs. Moreover, the PPAs were not entered into on behalf of WFP and thus there were no prior agreements between defendant and the individual plaintiff physicians who entered into the PPAs.

Having determined that the terms of the group agreement are controlling, we must next determine whether defendant complied with those terms in calculating each surplus for the years set forth in the complaint of the WFP plaintiffs and the

amended complaint, i.e., 2001 and 2003 through 2005, and the year set forth in the complaint of WFP and FHS, i.e., 1999. We reject defendant's contention that the group agreement unambiguously provided that the annual surplus shares of WFP and FHS were limited to 50% of the surplus, capped at the amount of the withhold. The group agreement provides in relevant part that, "in no event shall FHS['s] and WFP's share of any net deficit and surplus exceed the sum of amounts of the withhold," but it subsequently provides that, "in the event of a surplus, the full withhold plus 50% of the surplus shall be paid to FHS and WFP." We agree with the court that those provisions of the group agreement "cannot be interpreted in a way to avoid the inconsistenc[ies] and [that], although the specific provision controls when there is an inconsistency between a general provision and a specific provision . . . , here both provisions are specific" (*Contacare, Inc. v CIBA-Geigy Corp.*, 49 AD3d 1215, 1217 [2008], *lv denied* 10 NY3d 714 [2008]), and thus that the group agreement is as a matter of law inconsistent with respect to the surplus apportionment provision.

"It is a basic principle of contract law that a written document is to be construed against the party who prepared it where there are . . . contradictory provisions" (*Gillette v Heinrich Motors*, 55 AD2d 841, 841 [1976], *affd* 44 NY2d 661 [1978]; *see Rochester Home Equity v Guenette*, 6 AD3d 1119 [2004]; *see also Jacobson v Sassower*, 66 NY2d 991, 993 [1985]; *Brodsky v Levy*, 161 AD2d 1120, 1121-1122 [1990]). Nevertheless, that principle is not applicable where, as here, the party seeking to apply it participated in negotiating the terms of the document (*see Coliseum Towers Assoc. v County of Nassau*, 2 AD3d 562, 565 [2003], *lv denied* 2 NY3d 707 [2004]; *see also 67 Wall St. Co. v Franklin Natl. Bank*, 37 NY2d 245, 249 [1975]). Thus, we are relegated to the intent of the parties to the group agreement, and the "best evidence of [their] intent . . . is their conduct after [it was] formed" (*Waverly Corp. v City of New York*, 48 AD3d 261, 265 [2008]).

Here, we conclude that defendant established as a matter of law, based on the conduct of the parties to the group agreement after it was formed (*see id.*), that the parties intended that the group agreement cap the apportionment of the annual surplus, if any, at the amount of their withhold. As noted, plaintiffs did not object to their compensation when defendant capped the parties' surplus in 1999 at the amount of the withhold. In addition, in support of its motion defendant submitted the deposition testimony and an affidavit of plaintiff Donald F. Brautigam, WFP's president and chief executive officer, in which he

confirmed that it was not until approximately the year 2000 that WFP concluded that the group agreement provided that WFP was entitled to receive 50% of the annual surplus, if any, without a cap.

In opposing the motion, plaintiffs failed to present any evidence establishing that WFP and FHS did not intend to agree to defendant's cap of the surplus allotment in 1998, when they entered into the group agreement. Indeed, plaintiffs merely offered evidence of uncommunicated subjective intent, and subsequent interpretations of the group agreement, and plaintiffs therefore failed to raise an issue of fact to defeat the motion (see Wells v Shearson Lehman/American Express, 72 NY2d 11, 24 [1988], rearg denied 72 NY2d 953 [1988]; Sally v Sally, 225 AD2d 816, 818 [1996]). Present—Scudder, P.J., Smith, Peradotto and Pine, JJ.