No. 2-15-0940
Opinion filed September 15, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| TAILWIND HAVAYOLLARI; MUHSIN AKGUN; ORHAN PEHLIVAN; and GIZEM ESGIN, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 12-L-130 |
| | ) | |
| AAR AIRCRAFT SERVICES, INC., and AAR SERVICES, INC., | ) ) | |
| | ) | |
| Defendants-Appellees | ) | Honorable |
| | ) | Dorothy French Mallen, |
| (Tailwind Havayollari, Plaintiff-Appellant). | ) | Judge, Presiding. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Tailwind Havayollari (plaintiff), a Turkish civil aviation company, along with plaintiff's crew members Muhsin Akgun, Orhan Pehlivan, and Gizem Esgin, sued defendants, AAR Aircraft Services, Inc., and AAR Services, Inc. (collectively, AAR), which provide aircraft maintenance, alleging that AAR was liable for damages plaintiff suffered in an accident (the incident) that occurred on June 14, 2009, during a landing attempt by a leased aircraft (the Aircraft) that plaintiff was operating. After, and as a result of, the incident, plaintiff entered into an agreement (the Global Agreement) with International Lease Finance Corporation (ILFC)

and two companies affiliated with ILFC, Castle 2003-1BlLC and Castle 2003-2A LLC (the Castle Entities), that modified the terms of five aircraft lease agreements, including the lease covering the Aircraft. As part of the consideration, plaintiff also entered into a release agreement (the Release) that expressly released the Castle Entities and ILFC, as well as "all *** other entities not specifically identified" in the Release, from any and all liability related to the incident. AAR filed a motion for summary judgment based on the Release. Plaintiff argued that AAR was not within the scope of the Release and, alternatively, that the Release was ambiguous. The trial court granted summary judgment in favor of AAR, finding that the intention of the parties to the Release was to eliminate any litigation arising out of the incident, that AAR is unambiguously included as a released party under the phrase "all *** other entities not specifically identified," and that, therefore, the Release bars plaintiff's action against AAR. Plaintiff appeals the trial court's judgment. We affirm.

¶ 2                          I. BACKGROUND

¶ 3     Plaintiff operates airplane charter flights. On June 14, 2009, while operated by plaintiff, the Aircraft suffered a control failure during a landing attempt at Diyarbakir Airport, Diyarbakir, Turkey.

¶ 4     A post-incident inspection revealed a small metal roller embedded between the left power-control-unit input crank and the manifold stops, which are part of the Aircraft's elevator-control system. The Aircraft's prior lessee, Alaska Airlines, had hired AAR to perform maintenance services on the Aircraft in January 2009 at its facility in Oklahoma City, as part of Alaska Airlines' lease agreement with ILFC for redelivery of the Aircraft. AAR completed its work on the Aircraft "and carried out [the] ILFC check in accordance with the Alaska maintenance program." Plaintiff leased the Aircraft from ILFC in February 2009, after AAR had just

completed the Aircraft's inspection. Plaintiff alleges that the incident and plaintiff's resulting economic damages were due to the negligence of AAR in performing maintenance on the Aircraft in January 2009, five months prior to the incident. Plaintiff seeks in excess of $4 million in damages.

¶ 5 About seven months after the incident, in January 2010, plaintiff, the Castle Entities, and ILFC renegotiated the terms of five aircraft leases due to, *inter alia*, changing market conditions. AAR was not a party to the renegotiation. The renegotiation resulted in the Global Agreement. In partial consideration for the renegotiation, plaintiff, the Castle Entities, and ILFC entered into the Release, pursuant to which plaintiff released all claims "arising out of or in any way related to or resulting from the accident/incident which occurred on June 14, 2009," against ILFC, the Castle Entities, and "all other persons, firms, companies, corporations and other entities not specifically identified in this Waiver and Release Agreement."

¶ 6 The Release specifically states, in part:

"For and in consideration of the consideration and mutual covenants set forth in (i) [the Global Agreement] dated January 25, 2010[,] entered into between [ILFC and the Castle Entities] and [plaintiff] *** and (ii) this Full Waiver and Release Agreement *** [plaintiff] for itself and its affiliates, and all of its predecessors, successors, parents and subsidiaries, and all of its officers, directors, partners, employees, stock holders, agents, attorneys, representatives, administrators, insurers, subrogors, subrogees and all of the heirs, successors and assigns of any of them (collectively the 'Releasor'), to the fullest extent allowed by law, *expressly intends to release*, and by execution of this Waiver and Release Agreement does hereby release and forever discharge [ILFC and the Castle Entities], Deutsche Bank Trust Company Americas (acting in its capacity as security

trustee pursuant to the security trust agreement and as trustee pursuant to the indenture agreement), Phoenix American Financial Services, and their affiliates, and all of their predecessors, successors, parent and subsidiaries, and all of their officers, directors, employees, agents, attorneys, insurers and representatives, and all of the heirs, successors and assigns of any of them, *and all other persons, firms, companies, corporations and other entities not specifically identified in this Waiver and Release Agreement, without reservation* (*collectively the 'Released Parties'*) *of and from any and all liability*, *claims, damages, expenses, demands or causes of action which the Releasor have, claim to have or may have*, including but not limited to physical injuries, mental injuries, wrongful death and loss or destruction of personal property, loss of income, loss of future income, damage to reputation which the Releasor may have sustained or may hereafter sustain as a consequence or consequences flowing from, *arising out of or in any way related to or resulting from the accident/incident which occurred on June 14, 2009*[,] *involving the* [Aircraft]."   (Emphases added.)

¶ 7     The four named entities that signed the Release were the same four entities named in the Global Agreement.   As shown, the "Releasor" is defined as plaintiff "and its affiliates, and all of its predecessors, successors, parents and subsidiaries, and all of its officers, directors, partners, employees, stock holders, agents, attorneys, representatives, administrators, insurers, subrogors, subrogees and all of the heirs, successors and assigns of any of them."

¶ 8     Other Release provisions include:

"B. [T]his [Release] shall be complete and shall not be subject to any claim of mistake of fact or law by [plaintiff] and that it express a full and complete settlement of

liability claimed and denied; and that this [Release] is intended to be full, final, and complete.

C. In exchange for consideration to [plaintiff] hereinabove mentioned (including the consideration set forth in the Global Agreement), [plaintiff] is releasing all claims, including all damages and injuries.

* * *

G. [Plaintiff] further acknowledges and agrees that (i) it is represented by and obtained the advice of legal counsel prior to signing this Waiver and Release Agreement containing these waivers and releases, (ii) the content and legal effect of this [Release] have been explained to it by its counsel to its full satisfaction, (iii) it has read and understands this [Release], and (iv) it is executing these waivers and releases voluntarily, with full knowledge and [*sic*] their significance.

***

I. This [Release] will in all respects be governed and construed in accordance with the Laws of the State of New York (notwithstanding the conflict of Laws of the State of New York)."

¶ 9 An unexecuted draft of the Release specifically released the following three entities: AAR (erroneously written as "AARP"), Boeing (the manufacturer of the Aircraft); and Alaska Airlines. At plaintiff's insistence, these named entities were deleted from the final draft of the Release. According to Halim Aydin, plaintiff's chief financial officer, the parties to the Release did not intend the phrase "all other persons, firms, companies, corporations and other entities not specifically identified in this Waiver and Release Agreement" to restore, and thus release, the named entities that had been removed. They intended only to ensure that any person or entity

related to the parties to the Global Agreement, but not expressly named in the Release, would also be released.

¶ 10    Plaintiff and Akgun, Pehlivan, and Esgin (who are not parties to this appeal) filed a second amended complaint on September 7, 2011.   The second amended complaint alleged that AAR employees negligently left debris in the Aircraft while performing maintenance work. Plaintiff alleged that the incident caused substantial damage to the Aircraft and that Akgun, Pehlivan, and Esgin suffered significant personal injuries and emotional distress.   Plaintiff sought damages for the costs related to "engine damage," and all plaintiffs sought economic damages.

¶ 11    AAR filed a motion for summary judgment.   AAR argued that it was entitled to judgment as a matter of law, because it was included among the entities that plaintiff released from liability in the Release.   AAR also argued that plaintiff's claims were barred by the economic-loss doctrine.

¶ 12    On April 16, 2015, the trial court denied AAR's summary judgment motion, based on the economic-loss doctrine.   However, following additional argument, the trial court granted the motion, based on the Release.   Applying New York law, the court found that the Release was clear and unambiguous and that, therefore, the parol-evidence rule foreclosed considering extrinsic evidence, including the unexecuted draft, to interpret the Release.   The court further ruled that AAR was within the scope of the Release, based on the clause "all other persons." The court noted that "[c]learly, if Tailwind had wanted to maintain any cause of action whether based on tort or contract against any other entities, a release could have expressly stated that it did not waive or release any actions against those entities."   The court concluded that, even if it were to consider extrinsic evidence, the unexecuted draft demonstrated that plaintiff knew that it

had a potential cause of action against AAR, yet, despite that knowledge, decided to retain the language releasing "all other entities" "without reservation" in the executed Release. Additionally, the court observed that paragraph C of the Release provided that plaintiff was releasing all claims, "including all damages and injuries."

¶ 13    Plaintiff then filed a motion to reconsider or, in the alternative, to stay the matter pending the outcome of its action seeking to reform the Release, based upon mutual mistake, which it filed on May 29, 2015, in the New York Supreme Court.    See *Tailwind Havayollari v. Aercap, Inc.*, No. 651879/2015 (N.Y. Sup. Ct. 2015).    The trial court denied plaintiff's motion.

¶ 14    Thereafter, the trial court entered an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) with respect to its April 16, 2015, order.    That same day, the trial court granted a voluntary dismissal with leave to refile to Akgun, Pehlivan, and Esgin.[1]    Plaintiff timely appeals.

¶ 15                                        II. ANALYSIS

¶ 16    Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   735 ILCS 5/2-1005(c) (West 2014).   We review *de novo* an order granting summary judgment.   *Pielet v. Pielet*, 2012 IL 112064, ¶ 30.

¶ 17    We must review the Release in accordance with the law of New York, which the parties agree governs the Release.    Under New York law, a contract is construed according to the parties'

---

[1] Because the trial court's order finally resolved all claims against all parties, we have jurisdiction under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).  *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 503 (1997).

intent, which is best evidenced by their written agreement. *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). New York courts follow the " 'familiar and eminently sensible proposition of law [ ] that, when parties set down their agreement in a clear, complete document, their writing should *** be enforced according to its terms.' " *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (quoting *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). It is also well settled that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 580 (N.Y. 1969). This fundamental rule protects all entities whose rights depend on the written instrument, "even though they were not parties" to the contract. *Oxford Commercial Corp. v. Landau*, 190 N.E.2d 230, 231 (N.Y. 1963).

¶ 18    Plaintiff contends that the trial court erred in finding that the Release unambiguously operated to bar plaintiff from pursuing its negligence claim against AAR. Specifically, plaintiff maintains that the plain language of the Release states that it releases claims against only the named parties and those "related" to the named parties: ILFC, the Castle Entities, the two financial institutions, and those entities' predecessors, successors, and other affiliates. Plaintiff argues that, if it had intended to release AAR, it would have done so explicitly, as it did in the unexecuted draft. AAR responds that plaintiff overlooks the clear intent of the Release, which was to release all entities including itself.

¶ 19    Clearly, the Release does not specifically name AAR as a released entity. Thus, the issue is whether the provision pertaining to "all *** other entities" unambiguously included AAR.

¶ 20    Under New York law, there is no requirement that a release must specifically name or identify every discharged party.   Particularly instructive is *Wells v. Shearson Lehman/American Express, Inc.*, 526 N.E.2d 8 (N.Y. 1988).

¶ 21    In *Wells*, Wells had been a plaintiff in a class-action lawsuit that had challenged a proposed leveraged buyout.   *Id*. at 9-10.   In the present suit, the defendants were the financial advisors who had rendered their opinions as to the financial fairness of the consideration offered to Wells and the other shareholders in the proposed leveraged buyout, but they were not named as defendants in the class action.   *Id*. at 10.   Wells and the other class-action plaintiffs eventually settled and signed a release, which released "all claims *** that have been or could have been asserted by plaintiffs herein or any members of the Class against any defendant, *** *or against anyone else in connection with or that arise now or hereafter out of the Action*."   (Emphasis added and internal quotation marks omitted.)   *Id*.

¶ 22    When Wells sued the defendants, alleging that their opinions as to the financial fairness of the buyout were wrong and negligently or recklessly rendered, the New York Court of Appeals held that the action was barred by the release.   The court rejected Wells' arguments that a party can never be discharged from liability unless it is specifically named or identified in a release and that a general release of "anyone else" is necessarily ambiguous, requiring extrinsic evidence of intent.   *Id*. at 11-12.   The court held that Wells had to have known, from the face of the release, that she was discharging "anyone else" for claims connected with the buyout.   *Id*. at 14.   The court held that, while the defendants were not parties to the underlying class action, the release discharging the named defendants, their "agents *** representatives *** or anyone else," unambiguously precluded Wells' action against the defendants.   The court surmised that, because the related persons already were identified specifically, the phrase "anyone else" must have

necessarily referred to persons unrelated to the defendants in the class-action lawsuit and that, when placed in context, the phrase did not refer to "all the world generally," but was limited to those who were connected with the events at issue. *Id*. at 15.

¶ 23    Plaintiff attempts to distinguish *Wells* by arguing that, unlike in the present case, the release in *Wells* was limited to a class of persons connected with the events at issue. We are not persuaded. Here, the Release expressly states that plaintiff is releasing "any claims arising out of or in any way related to the accident/incident" that occurred on June 14, 2009. Similar to the language in *Wells*, by releasing all claims arising out of or related to the incident, the Release clearly limits its scope to those within the class of entities that are connected in some way with the incident. See also *White v. Laidlaw Transit, Inc.*, 796 N.Y.S.2d 466 (App. Div. 2005) (holding defendant was within the class of entities discharged pursuant to the release provision, "all other persons, firms, or corporations who are or might be liable" (internal quotation marks omitted)); *Tamayo v. Ford Motor Titling Trust*, 726 N.Y.S. 2d 709 (App. Div. 2001) (holding defendant was within the class of entities discharged pursuant to the release provision, "all other persons, firms or corporations liable, or who might be claimed to be liable" (internal quotation marks omitted)).

¶ 24    Plaintiff cites *Wild v. Finger Lakes Racing Ass'n*, 595 N.Y.S.2d 590 (App. Div. 1993), for the proposition that a party may release all persons from specific claims, and named parties from all claims, but that the law will not infer an intent to release all persons, known and unknown, from all claims. However, here, as in *Wells*, plaintiff released all persons from very specific claims.

¶ 25    Plaintiff relies on *Krysty v. Town of Royalton*, 796 N.Y.S.2d 489 (App. Div. 2005), which is readily distinguishable. In *Krysty*, the court found a release provision ambiguous as to whether a nonspecified entity was among the class of entities intended to be released. The court found the provision ambiguous primarily because it purported to discharge unknown persons yet also denied

any fault on their behalf. *Id.* at 490. The court further noted that, although the release purported to extend to all other "persons, firms, or corporations," it later specified that only certain entities were "entitled to *** the rights" of the release. (Internal quotation marks omitted.) *Id.*

¶ 26    As in *Wells*, the Release in the present case does not deny the fault of unknown parties. In fact, section A of the Release indicates that any consideration provided by ILFC and other parties named in that section is not to be considered as an admission of liability. This provision is expressly limited to the named parties and does not contain language including unknown parties.

¶ 27    Furthermore, as in *Wells*, this case does not involve boilerplate language found in preprinted releases. The Release is a tailor-made document that was independently negotiated as part of a complex commercial transaction in which plaintiff was represented by counsel. See *Oxford Commercial*, 190 N.E.2d at 231-32 (evidence that parties intended to exclude defendants from all-inclusive category of "any person whomsoever" would not be admissible; "plaintiff's promise reached after lawyer-guided negotiations and containing provisions quite unlike the stereotyped verbiage found in the usual standard general release" permitted no other conclusion).

¶ 28    Furthermore, the description of the discharged parties, when read in the context of the Release, makes it clear that the parties intended to put an end to the claims related to the incident. Section B of the Release states that it expresses "a full and complete settlement of liability claimed" and "is intended to be full, final and complete."

¶ 29    In *Wells*, the New York Court of Appeals stated:

> "Affirmance [of the intermediate appellate court] would be tantamount to the adoption of an inflexible rule that every release must invariably specify every party to be discharged or the transaction will be at risk of later unraveling; that, however sophisticated the matter, however informed and counseled the plaintiff, and however plain the words and

purport of the document, there could never be a release that truly put an end to the disputed commercial transaction. We do not believe that is what the legislature of *** New York intended, or the law requires." *Wells*, 526 N.E.2d at 15-16.

Because we are bound to enforce New York law in interpreting the Release, the language of that state's highest court applies equally to the facts here.

¶ 30 In sum, plaintiff's promise contained in the Release permits no conclusion other than that plaintiff intended to release AAR from all liability arising out of or in any way related to or resulting from the incident that occurred on June 14, 2009, involving the Aircraft. Because the Release bars plaintiff's action against AAR, we need not address AAR's alternative ground for affirming summary judgment in its favor, based on the economic-loss doctrine.

¶ 31                                III. CONCLUSION

¶ 32 For the foregoing reasons, the judgment of the circuit court of Du Page County granting summary judgment in favor of AAR and against plaintiff is affirmed.

¶ 33 Affirmed.