DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PHILIP MORRIS USA INC.,** and
**R.J. REYNOLDS TOBACCO COMPANY,**
Appellants,

v.

**BEATRICE SKOLNICK,** as personal representative of the
**ESTATE OF LEO SKOLNICK,** deceased,
Appellee.

No. 4D13-4696

[July 15, 2015]

Appeal and cross-appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; David F. Crow, Judge; L.T. Case No. 502009CA004045-AG.

Amir C. Tayrani of Gibson, Dunn & Crutcher, LLP, Washington, D.C., Joseph H. Lang, Jr. of Carlton Fields Jorden Burt, P.A., Tampa, and Peter M. Henk of Shook Hardy & Bacon, L.L.P., Houston, Texas, for appellant, Philip Morris USA, Inc.

Gregory G. Katsas of Jones Day, Washington, D.C., for appellant, R.J. Reynolds Tobacco Company.

David J. Sales of David J. Sales, P.A., Jupiter, John S. Mills of The Mills Firm, P.A., Tallahassee, and Jonathan R. Gdanski of Schlessinger Law Offices, P.A., Fort Lauderdale, for appellee.

GROSS, J.

In this *Engle*[1] progeny case, plaintiff Beatrice Skolnick recovered compensatory damages from two tobacco companies—Philip Morris USA Inc. and R.J. Reynolds Tobacco Company. The jury found for the defendants on claims of fraudulent concealment and conspiracy to commit fraudulent concealment.

---

[1] *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006).

We confront a novel issue in an *Engle* case. In 2004, as a plaintiff in a New York class action, Beatrice executed a settlement agreement, containing a release and covenant not to sue concurrent tortfeasors, where the injury at issue was her husband's lung cancer. We hold that this settlement agreement applies to bar the strict liability and negligence causes of action in this case. However, under New York law, the release and covenant not to sue do not bar the intentional tort claims of fraudulent concealment and conspiracy to commit fraudulent concealment.

Beatrice cross-appealed from the defense verdict on the intentional tort counts. As to those counts, the trial court applied our decision in *Philip Morris USA, Inc. v. Hess*, 95 So. 3d 254 (Fla. 4th DCA 2012). The Florida Supreme Court quashed this decision in April 2015. *See Hess v. Philip Morris USA, Inc.*, 40 Fla. L. Weekly S188 (Fla. Apr. 2, 2015).

We reverse the judgment for the plaintiff on the strict liability and negligence counts and remand to the circuit court for the entry of a judgment for the defendants. On the cross-appeal, we reverse the judgment for the defendants on the fraudulent concealment and conspiracy counts and remand for a new trial.

### *The Release in the New York Action*

In 2002, Beatrice joined hundreds of plaintiffs in a New York class action lawsuit against Verizon Communications Inc. and other defendants responsible for the operation of the Sylvania Plant ("the Hicksville Action"), which was located just 500 meters from Beatrice and Leo Skolnick's Westbury home. The complaint alleged the "facility emitted toxins into the surrounding environment located in Hicksville, New York," which "contaminated the air, soil, surface water and ground water in the surrounding communities." As it concerned Leo Skolnick, the complaint set forth the following:

> Beatrice Skolnick, individually, and as Administratrix of the Estate of Leo Skolnick ("decedent"), . . . brings an action for both conscious pain and suffering and wrongful death on behalf of the decedent. From the time period beginning in July of 1959 and ending in September of 1984, decedent resided [in] Westbury, New York, within close proximity of the Sylvania facility sites. **As a result of Defendants' repeated releases of toxic, hazardous and/or radioactive substances into the area surrounding their operations on or near the Sylvania facility, decedent developed colon and lung cancer**. While prior to the development of his disease, decedent had been a healthy and active person, the onset of the cancers had a debilitating effect on his life,

- 2 -

causing him severe physical injury, pain and suffering, and mental and emotional damage, as well as causing him to incur extensive medical and related expenses and lost income. This same disease ultimately lead to his death in 1993.

(Emphasis added).

The class action settled for $10,400,000, with Beatrice receiving a $60,000 share. In a 38-page settlement agreement, which states that it is to be governed by New York law, the Hicksville parties settled "the claims described herein against" the listed defendants and the plaintiffs agreed to a release. The settlement agreement indicated that the "Hicksville Actions concern[ed] the operations of and alleged emissions and discharges from a facility that manufactured nuclear fuel elements from approximately 1952 until 1966." Consistent with this description, the agreement defined "Released Claims" as including any and all actions "which ar[o]se out of or relate[d] to":

> (1) any claim asserted, or that could have been asserted, in the Hicksville Actions . . . or (2) (a) the operation or conduct of the Hicksville Facility and/or the Hicksville Sites, and/or (b) any condition of the premises, the exterior or interior environment at the Hicksville Facility and/or the Hicksville Sites, and/or (c) any condition, result, effect or impact allegedly created, endured or caused by the business, manufacturing, waste removal or activities performed or taking place at the Hicksville Facility and/or the Hicksville Sites.

The persons to be "released" were defined to include a number of corporations and entities filling two-and-a-half pages.

Beginning on page 24, the settlement agreement sets the contours of the plaintiffs' release, stating initially that upon an identified "effective date" the releasers—i.e., the class plaintiffs—"shall be deemed to have, and by operation of th[e] Agreement shall have[] . . . fully, finally, and forever released, relinquished and discharged the Released Persons from any and all of the Released Claims." The agreement further stated that the agreement and release "may be pled as a full and complete defense to any Released Claims that may be instituted, prosecuted or attempted in breach of th[e] agreement."

Paragraph 26 then expanded from the release into the plaintiffs' covenant not to sue "any other tortfeasors, whether joint or concurrent and whether now known or unknown," stating:

26.  **Releasors covenant not to sue any other tortfeasors, whether joint or concurrent and whether now known or unknown, for losses or injuries alleged in the Hicksville Actions or at issue in the Released Claims**.  This covenant does not apply to future claims based on the aggravation of the losses or injuries alleged in the Hicksville Actions.  Releasors may sue future tortfeasors if such tortfeasors aggravate and/or increase the severity of a loss or injury alleged in the Hicksville Actions.

(Emphasis added).

As required by the settlement agreement, in 2004 Beatrice executed a "Verified Declaration for Allocation of Settlement Proceeds" for her "Wrongful Death Claim."  In the declaration, Beatrice asserted that the "illness[] or injur[y] . . . that caused the decedent's death" was "lung cancer."  Beatrice further attested that the lung cancer "diagnosis was ultimately confirmed at [Leo's] death" as dictated in his death certificate.

*Motion for Summary Judgment*

Prior to trial, the defendants moved for summary judgment on their affirmative defense that Beatrice's tobacco claims were barred by Paragraph 26's covenant not to sue since Beatrice was suing "other tortfeasors" for the same "loss[] or injur[y] alleged in the Hicksville Actions"—i.e., that Leo died from lung cancer.  The defendants argued that because the settlement agreement was defined to include Beatrice's "claim for [Leo's] lung cancer and death," the covenant not to sue "bar[red her] from suing 'any other tortfeasors' for [Leo's] lung cancer, even if those tortfeasors were 'unknown' to her at the time she entered into the Settlement Agreement."  Beatrice responded with numerous counterarguments, one of which was that the defendants' interpretation of the release was unreasonable since the release and settlement agreement sought to resolve an entirely separate action and the "only losses or injuries alleged in the Hicksville Actions or at issue in the Released Claims were those caused by releases of contaminants from the New York defendants[]."  "Had the New York defendants intended the [covenant not to sue] to achieve the extraordinary result that the tobacco defendants now claim for it," Beatrice argued, their "sophisticated counsel certainly would have expressed that intent more clearly."

At a hearing on the motion, the trial court questioned the merits of the defendants' motion because Beatrice's tobacco claims and Hicksville claims were "totally different, essentially different torts altogether."  Three days later, the trial court entered a written order denying the summary judgment motion, citing New York's General Obligations Law § 15-108 and

two cases—*Long Island Pipe Fabrication & Supply Corp. v. S & S Fire Suppression Sys., Inc.*, 641 N.Y.S.2d 477 (N.Y. App. Div. 1966), and *Wells v. Shearson Lehman/Am. Express, Inc.*, 526 N.E.2d 8 (N.Y. 1988).

### *The release and covenant not to sue in the Hicksville Action barred the negligence and strict liability causes of action, but not the intentional torts of fraudulent concealment or conspiracy to commit fraudulent concealment*

The crucial issue in this case concerns whether these provisions of the settlement agreement for the Hicksville class action—in particular, Paragraph 26—bar Beatrice from bringing her tobacco suit, since both are predicated on the Leo's death from lung cancer. The covenant not to sue covers "joint or concurrent" tortfeasors, "whether now known or unknown." The tobacco companies here are concurrent tortfeasors with the Hicksville defendants, so they stand under the umbrella of the covenant not to sue.

### *Standard of Review*

Because this issue arises from a summary judgment and the construction of an unambiguous contract, our review is de novo. *See Dennis v. Kline,* 120 So. 3d 11, 20 (Fla. 4th DCA 2013) (orders on summary judgment motions are reviewed de novo); *Berman v. Parco*, 986 F. Supp. 195, 208-09 (S.D.N.Y. 1997). Furthermore, since the Hicksville settlement agreement so dictates, we apply New York law in interpreting its language. *See Blechman v. Estate of Blechman*, 160 So. 3d 152, 157-58 (Fla. 4th DCA 2015).

### *Analysis*

Releases and covenants not to sue are a species of contract construed under the principles of contract law. *See Bank of Am. Nat'l Trust and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985). The threshold inquiry in interpreting a release or covenant not to sue is whether its terms are unambiguous, *see Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000), *i.e.*, whether "there is no reasonable basis for a difference of opinion." *Greenfield v. Phillies Records*, 780 N.Y.S.2d 562, 569-70 (N.Y. 2002) (internal quotation omitted). If the release or covenant not to sue is clear on its face, its construction is "a matter of law, appropriate for summary judgment resolution." *Berman*, 986 F. Supp. at 208-09 (applying New York law).

In construing an unambiguous release or covenant not to sue, "effect must be given to the intent of the parties as indicated by the language employed." *Shklovskiy v. Khan*, 709 N.Y.S.2d 208, 209 (N.Y. App. Div. 2000). In gleaning intent, "[t]he meaning and coverage of a release

- 5 -

necessarily depends upon the controversy being settled and upon the purpose for which the release was given," *Apfel v. Prestia*, 838 N.Y.S.2d 605, 606 (N.Y. App. Div. 2007); *see also Nucci v. Nucci*, 987 N.Y.S.2d 176, 177 (N.Y. App. Div. 2014). "Obviously, 'a release may not be read to cover matters which the parties did not desire or intend to dispose of.'" *Peterson v. Regina*, 935 F. Supp. 2d 628, 636 (S.D.N.Y. 2013) (quoting *Cahill v. Regan*, 184 N.Y.S.2d 348, 157 N.E.2d 505, 510 (N.Y. 1959)). "Moreover, because the 'law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing],' a release which purports to excuse a party from responsibility for misconduct is subject to the 'closest of judicial scrutiny.'" *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001) (quoting *Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry*, 494 N.Y.S.2d 721, 723 (N.Y. App. Div. 1985)).

The intent of the parties is not the only consideration when evaluating a release or covenant not to sue. Under New York's General Obligations Law § 15-108(a), a release or covenant not to sue given to one tortfeasor will not discharge other tortfeasors liable for the same injury—whether under theories of joint, successive, or vicarious liability—unless the terms of the release "expressly so provide." *Tufail v. Hionas*, 549 N.Y.S.2d 436, 437 (N.Y. App. Div. 1989). Section 15-108(a)'s purpose is to abrogate the harsh common law principle that the "release of one joint tort-feasor automatically released all."[2] *Wells v. Shearson Lehman/Am. Exp., Inc.*, 526 N.E.2d 8, 12 (N.Y. 1988). By enacting Section 15-108(a), the New York Legislature sought "to prevent the automatic release of unnamed parties by limiting the effect of a release to that of the language it contains." *Id.* at 14. "What it achieved was a requirement that a release not discharge 'everyone' or 'anyone' without saying so." *Id.* The sentiment is that "a

---

[2]As the 1972 Law Revision Commission explained in a report supporting the bill's passage in the New York Legislature:

> The [common-law] rule sets a trap for the average man, who quite reasonably assumes that settling his claim with one person does not have any effect on his rights against others with whom he did not deal. At present it is necessary for the claimant to make an express disclaimer in his release of any intent to release persons other than those named in it. It is more in accord with common understanding to provide that the release means just what it says; if it does not purport to release a party by its express terms, it should not affect his liability.

*Wells*, 526 N.E.2d at 14 (quoting 1972 Report of N.Y. Law Rev. Commn., 1972 N.Y. Legis Doc. No. 65[K], 1972 McKinney's Session Laws of N.Y., at 3237, 3239).

plaintiff should never be deprived of a cause of action against any wrongdoer when the plaintiff has neither intentionally surrendered the cause of action nor received substantially full compensation." Keeton, et al., *Prosser and Keeton, Law of Torts*, § 49, at 335 (5th ed. 1984).

When the language of a release or covenant not to sue, as here, is general, without identifying specific defendants, there are three approaches to interpreting the "expressly so provide[s]" statutory language: (1) the "flat bar" rule, (2) the "specific intent" rule, and (3) the "intent" rule. New York subscribes to the "flat bar" rule, which, in the context of releases, says "that a general release discharging all other parties who might be liable for damages in addition to a named tortfeasor is sufficient to release a joint tortfeasor not named or specifically identified in the release." *Moore v. Missouri Pac. R.R.*, 773 S.W.2d 78, 80 (Ark. 1989); *Luther v. Danner*, 995 P.2d 865, 868 (Kan. 2000); *Dobson v. Citizens Gas & Coke Utility*, 634 N.E.2d 1343, 1344-45 (Ind. App. 1994). "Most 'flat bar' courts hold that, because a release purporting to discharge . . . other parties from liability is unambiguous, it must be construed with reference only to the language used and not to any extrinsic evidence of the parties' intent." *Sims v. Honda Motor Co.*, 623 A.2d 995, 999 (Conn. 1993). Thus, it is not "relevant, under the flat bar rule, that the unnamed tortfeasor (who seeks to assert the release as an affirmative defense) failed to pay consideration." *Noonan v. Williams*, 686 A.2d 237, 242 (D.C. 1996).[3]

New York's adoption—and application—of the "flat bar" rule arose in *Wells v. Shearson Lehman/American Express, Inc.*, 526 N.E.2d 8, a case cited by the trial court in its summary judgment order. In *Wells*, the plaintiff and other members of a class action lawsuit entered into a settlement agreement with Metromedia, its directors, and a separate company to resolve a dispute over a buyout. *Id.* at 15-16. The settlement agreement contained a release, which provided that:

> all claims . . . that have been or could have been asserted by
> plaintiffs herein or any members of the Class against   any

---

[3]In comparison, the "specific identity" rule "plac[es] a requirement that for a release given to one tortfeasor to discharge other potential tortfeasors from liability[,] the release must name or otherwise specifically identify such other tortfeasors." *Moss v. City of Oklahoma City*, 897 P.2d 280, 286 (Okla. 1995); *Young v. State*, 455 P.2d 889m 893 (Alaska 1969); *Moore*, 773 S.W.2d at 80-81. The "intent" rule represents the middle road approach; "[r]ather than presume that the parties' intent was fully expressed within the four corners of the release or that, despite the broad language of the release, the parties did not intend it to discharge all joint tortfeasors from liability, these courts consider extrinsic evidence of the parties' intent to determine the scope of the release." *Sims*, 623 A.2d at 1001.

defendant, or against any of the officers, directors, agents, attorneys, representatives, affiliates and general and limited partners of any defendant, or against anyone else in connection with or that arise now or hereafter out of the Action, the Settlement (except for compliance with the Settlement), or any matters, transactions or occurrences referred to in the complaint or in the Stipulation, including the recitals herein (the 'Settled Claims') shall be compromised, settled, released and dismissed with prejudice.

*Id.* at 16. Twice, the release expressed the parties' "intention to put plaintiffs' claims regarding the buyout finally to rest." *Id.*

After entering into the settlement agreement, the plaintiff instituted an action against Metromedia's financial advisors for damages related to the buyout. *Id.* at 11. The New York Court of Appeals affirmed the lawsuit's dismissal on the grounds the latter action fell within the scope of the release, which "expressly provided" for "the release of persons other than the named defendants in the class action"—namely, "anyone else in connection with the buyout." *Id.* at 14. Considering the release's expansive language, the court held the plaintiff "had to have known, from the face of th[e] release, that she was discharging . . . 'anyone else' for claims connected to or arising out of the buyout." *Id.* Such intent was further bolstered by the release's language indicating that it sought to resolve the buyout situation in its entirety. *Id.* at 15.

Beatrice argues *Wells* militates in her favor since it "emphasize[s] the need to take stock of the purpose of a given release"—which in this case was to resolve the radiation action. This argument views the Hicksville settlement agreement with tunnel vision. No one disputes the Hicksville defendants sought to wipe their hands clean of further litigation with that action. What Beatrice misses, however, is that the language contained within the covenant not to sue—which is prospective—does not simply bar the plaintiffs from bringing suit against those involved with the radiation exposure. Nor does the covenant not to sue constrain itself to the underlying cause of action. It speaks to shielding "other tortfeasors, whether joint or concurrent" from suits for "losses or injuries alleged in the Hicksville Actions or at issue in the Released Claims." In other words, the plaintiffs were barred from suing anyone who would be a joint or concurrent tortfeasor should the allegations of the Hicksville actions have been proven. As will be discussed, the Hicksville defendants chose those words for a reason—to put an end to related litigation by protecting themselves from future contribution and apportionment claims.

Contribution permits a "tortfeasor who pays more than his appropriate share . . . to recover contribution from other tortfeasors, by separate suit or by asserting third party claims against them in the plaintiff's suit." Dan B. Dobbs, *The Law of Torts* § 386, at 1079 (2000); *see also Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 517 N.E.2d 1360, 1363 (N.Y. 1987) (stating that the "adjudicated tort-feasor [can] seek contribution, or 'partial indemnity', from another tort-feasor whether or not the second tort-feasor had been made a party to the action"). In New York, "[t]he 'critical requirement' for apportionment by contribution . . . is that 'the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought.'" *Raquet v. Braun*, 681 N.E.2d 404, 407 (N.Y. 1997) (quoting *Nassau Roofing & Sheet Metal Co., Inc. v. Facilities Dev. Corp.*, 523 N.E.2d 803, 805 (N.Y. 1988)). "Thus, contribution is available whether or not the culpable parties are allegedly liable for the injury under the same or different theories and the remedy may be invoked against **concurrent**, successive, independent, alternative and even intentional tortfeasors." *Id.* (internal citations and quotation marks omitted) (emphasis added).

In New York, the principle allowing apportionment among tortfeasors arose from *Dole v. Dow Chemical Co.*, 282 N.E.2d 288 (N.Y. 1972), where the court "permit[ted] apportionment of damages among joint or concurrent tort-feasors regardless of the degree or nature of the concurring fault." *Kelly v. Long Island Lighting Co.*, 286 N.E.2d 241, 243 (N.Y. 1972). As espoused by *Dole*, and later codified by statute, the principle would apply "where the negligence of an alleged joint and concurrent tort-feasor, albeit entirely passive, is alleged to have shared in the causation of the injuries and damage giving rise to the apportionment-seeker's liability." *O'Sullivan v. State*, 371 N.Y.S.2d 766, 781 (N.Y. Ct. Cl. 1975); *see also Rogers v. Dorchester Assocs.*, 300 N.E.2d 403, 409 (N.Y. 1973) (stating that apportionment would "appl[y] when two or more tort-feasors have shared, albeit in various degrees, in the responsibility by their conduct or omissions in causing an accident, in violation of the duties they respectively owed to the injured person").

Why is this important? Under their worst case scenario, the Hicksville defendants and the tobacco Defendants would have been concurrent tortfeasors because their independent tortious acts combined to cause the same injury—Leo's lung cancer and wrongful death. Tortfeasors work concurrently "when their independent acts concur to produce a single or indivisible injury." *Kirkpatrick v. Chrysler Corp.*, 920 P.2d 122, 126 (Okla. 1996) (citation omitted); *see also* Dobbs, *supra*, § 174, at 423 n.5 ("Courts

now say that tortfeasors are concurrent tortfeasors if their independent acts lead to an indivisible injury.").

Smoking and other cancer-inducing agents—such as asbestos—can give rise to a concurrent tortfeasor scenerio where both contribute to the same disease or illness. *See, e.g.*, *Carter v. Wallace & Gale Asbestos Settlement Trust*, 96 A.3d 147, 158 (Md. 2014) ("If a tobacco company could have been joined as a joint tortfeasor in this litigation, we could have had a concurrent tortfeasor scenario."); *see also* Kan M. Nawaday, *Apportioning Asbestos-Tobacco Liability in Falise v. American Tobacco*, 88 Cornell L. Rev. 1142, 1146-49 (2003) (discussing the attempts by asbestos defendants to seek apportionment and contribution from tobacco companies as joint or concurrent tortfeasors). The reason is that smoking and other harmful products can have a synergistic effect towards causing cancer. As commentators have explained in the context of asbestos:

> asbestos and tobacco smoke are complex carcinogens that can affect multiple steps in the multistage process of cancer evolution, and that the combined effects will depend on the relative magnitude of each carcinogen at each stage. As reported in different studies, the interactive effect ranges from less than additive to supramultiplicative, but the model for insulation workers approximates a multiplicative effect. If the multistage model of carcinogenesis holds, and asbestos and smoking act at different stages, then a multiplicative relationship follows.

George A. Peters & Barbara J. Peters, *Asbestos Pathogenesis and Litigation*, Vol. 13 of the Sourcebook on Asbestos Diseases: Medical, Legal, and Technical Aspects 149 (1996).

The Hicksville "radiation" defendants and the tobacco companies are concurrent tortfeasors. Leo died of lung cancer, whether caused by exposure to radiation, smoking, or a combination of both. If it were indeed the latter—if the radiation, like asbestos, functioned synergistically with tobacco carcinogens to cause Leo's lung cancer—then Beatrice could have filed her wrongful death lawsuit against either the Hicksville defendants or the tobacco defendants, just as she did. Either defendant, as occurred in this case, could have asserted the other was the true cause of Leo contracting lung cancer. And the tobacco companies could have at least attempted to seek contribution from the Hicksville defendants. *Cf. Nawaday*, supra, at 1146-49.

A prime goal of many class action defendants is to put an end to litigation. Had the Hicksville defendants not entered into the covenant not to sue, they may have left "themselves open to an action for contribution

to a judgment obtained by the Plaintiff against another tortfeasor." *Morison v. Gen. Motors Corp.*, 428 F.2d 952, 954 (5th Cir. 1970). As the Eighth Circuit has explained, "[t]he defendant who originally procures the release gains nothing if the plaintiff can sue other joint or concurrent tortfeasors. In such a case, the original defendant is left open to claims for contribution and/or indemnity and may wind up having to litigate the case anyway." *Douglas v. U.S. Tobacco Co.*, 670 F.2d 791, 794 (8th Cir. 1982).

New York resolved this issue in 1974 by passing General Obligation Law § 15-108(b), which states that "[a] release given in good faith by the injured person to one tortfeasor . . . relieves [the tortfeasor] from liability to any other person for contribution." However, "[a] minority of states with a statutory right of contribution . . . allow nonsettling tortfeasors to obtain contribution from released joint tortfeasors to the extent and in the manner that contribution is allowable in the jurisdiction and provided that the liability has accrued." Jean Macchiaroli Eggen, *Understanding State Contribution Laws and Their Effect on the Settlement of Mass Tort Actions*, 73 Tex. L. Rev. 1701, 1707-08 (1995).

Here, the Hicksville action was a mass tort involving hundreds of plaintiffs. The radiation exposure occurred decades before the settlement, meaning many of the plaintiffs—such as the Skolnicks—had moved from New York. Without question the Hicksville defendants wanted to avoid the headache of numerous contribution and indemnity claims. Beatrice's covenant not to sue other concurrent tortfeasors thus served an important purpose in the settlement agreement.

We reject Beatrice's argument that the covenant not to sue is prospective only and thus does not apply to her lawsuit, which she contends relates back in time to when the *Engle* class action was originally filed. First, the release was sufficiently broad to cover her tobacco lawsuit. Second, and more importantly, Beatrice overlooks the mechanics of joining the *Engle* class. The covenant not to sue was signed in 2004, years before the Supreme Court decertified the *Engle* class. While we agree that "Engle progeny plaintiffs are in the same position they would have been in had they filed a complaint identical to the Engle class-action complaint on the same date the original complaint was filed," *R.J. Reynolds Tobacco Co. v. Ciccone,* 123 So. 3d 604, 616 (Fla. 4th DCA 2013), *rev. granted*, 147 So. 3d 526 (Fla. 2014) (quoting *Soffer v. R.J. Reynolds Tobacco Co.*, 106 So. 3d 456, 460 (Fla. 1st DCA 2012)), Beatrice had to take the further step, following the Florida Supreme Court's decertification in *Engle*, to *file* an individual action. *See Graham v. R.J. Reynolds Tobacco Co.*, 782 F.3d 1261, 1264 (11th Cir. 2015); *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d

419, 432 (Fla. 2013). Filing an individual action is precisely what she promised not to do in the Hicksville settlement.

*The Hicksville covenant not to sue does not apply to intentional torts*

New York public policy precludes an exculpatory clause, such as a covenant not to sue, from applying to intentional torts. "[N]o matter how flat and unqualified its terms," an "exculpatory agreement" "will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts." *Kalish-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983). As the New York Court of Appeals has written,

> an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.

*Id.* at 416-17 (footnotes omitted). An agreement which "purports to grant exemption from liability for willful" acts "will be viewed as wholly void." *Lago v. Krollage*, 575 N.E.2d 107, 110 (N.Y. 1991).

The egregious nature of the fraudulent concealment and conspiracy to commit fraudulent concealment at issue in this case renders the release and covenant not to sue in the Hicksville settlement agreement inapplicable to these intentional torts.

*The trial court erred by relying upon this Court's decision in* Philip Morris USA, Inc. v. Hess, *95 So. 3d 254 (Fla. 4th DCA 2012), to provide an improper instruction on the statute of repose*

On her cross-appeal, Beatrice contends the trial court reversibly erred by relying upon this Court's decision in *Philip Morris USA, Inc. v. Hess*, 95 So. 3d 254 (Fla. 4th DCA 2012), in providing an improper instruction on the statute of repose. Pursuant to the statute of repose, fraud claims "must be begun within 12 years after the date of the commission of the alleged fraud." § 95.031(2)(a), Fla. Stat. (2012). In *Hess*, this Court held that the statute of repose barred a claim for damages based on fraudulent concealment, where the jury specifically found that the plaintiff relied only on conduct that occurred more than twelve years before the filing date for the *Engle* class action—May 5, 1994. Recently, the Florida Supreme Court reversed *Hess,* holding that "the defendant's last act or omission triggers Florida's fraud statute of repose." *Hess v. Philip Morris USA, Inc.*, 40 Fla. L. Weekly S188 (Fla. Apr. 2, 2015). Therefore, the court reasoned that "for statute of repose purposes it is not necessary that the smoker relied during

the twelve-year repose period. Where there is evidence of the defendant's wrongful conduct within the repose period, the statute of repose will not bar a plaintiff's fraudulent concealment claim." *Id.* Plaintiffs could therefore rely on statements made prior to May 5, 1982.

In this case, the trial judge instructed the jury that in resolving the fraudulent concealment and conspiracy claims it could not consider any evidence of "alleged statements, concealment or other conduct that occurred before May 5th, 1982." This was error because our precedent was in error. The error was hardly harmless. Beatrice provided extensive testimony of misleading and untruthful statements by the tobacco industry *prior* to 1982, while Leo was in the prime of his life. We cannot say beyond a reasonable doubt that the erroneous instruction did not contribute to the defense verdict on the intentional tort claims. *See Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1256 (Fla. 2014).

We reverse the judgment on the intentional tort claims and remand for a new trial. We reverse the judgment on the negligence and product liability claims and remand for the entry of a judgment for the defendants.

CIKLIN, C.J., and STEVENSON, J., concur.

\*      \*      \*

***Not final until disposition of timely filed motion for rehearing.***